**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | : | |
| JOSEPH S. BARONE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No. |
| v. | : | **12 Civ. 4103 (LAK)(MHD)** |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| SPECIAL AGENTS MICHAEL | : | |
| GATEA, GREGORY MICELI and | : | JURY TRIAL DEMANDED |
| MICHAEL TROMBETTA in their | : | |
| official capacities as agents of the Federal | : | |
| Bureau of Investigation and in their | : | |
| individual capacities, | : | |
| | : | |
| Defendants. | : | |

## <u>AMENDED COMPLAINT</u>

Plaintiff, JOSEPH S. BARONE, by his attorneys, Herzfeld & Rubin, P.C., alleges as follows:

### PRELIMINARY STATEMENT

1.    This civil rights action seeks damages from the United States government, and its law enforcement officers, for the egregious mistreatment and abuse of a long-term confidential informant to the Federal Bureau of Investigation in the area of organized crime.

2.    In January 2009, following approximately 18 years of dedicated and undisputedly valued service to the FBI, agents of the United States government falsely arrested, imprisoned and maliciously prosecuted Plaintiff Joseph S. Barone on trumped up charges that he had participated in a murder-for-hire plot, and intentionally

placed him and his family in the gravest danger and distress by publicly leaking his name and status as a mob informant, throwing him in a special housing unit away from his loved ones, among the numerous other government abuses.

   3. As further set forth herein, these abuses were motivated by federal agents' personal malice toward Plaintiff, to punish Plaintiff unlawfully, and cause him injury, for his refusal to engage in telephone surveillance of high level organized crime figures- a high risk surveillance activity which Plaintiff had never previously done, and which would have completely blown Plaintiff's informant cover at great, imminent grave danger to Plaintiff's life, health, and livelihood as well as that of his loved ones.

## JURISDICTION

   4. The jurisdiction of this Court is invoked under Title 28 U.S.C § 1331, §1367(a) as well as §1343(a)(3) and (4).  This action arises, in part, under the Federal Tort Claims Act (FTCA) (28 U.S.C. § 2671 et. Seq., and 28 U.S.C. § 1346, and § 1335 as herein more fully appears.

   5. Pursuant to 28 U.S.C. § 2675, tort claims were presented to the United States Department of Justice (DOJ), the Federal Bureau of Investigations (FBI), and the Federal Bureau of Prisons (BOP).  Said agencies have denied stated claims. Plaintiff has therefore exhausted his administrative remedies.

   6. This case is brought, in part, pursuant to the United States Constitution and its Amendments including, but not limited to, the Fourth, Fifth, Eighth and Fourteenth Amendment to the U.S. Constitution and the case of *Bivens v. Sixth Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) (*"Bivens"*).

7.     The FTCA claims are timely pursuant to 28 U.S.C. § 2401(b) in that they were presented to the appropriate agencies on June 6, 2011 and within two years of accrual of each cause of action, and this action was originally filed within six months upon the expiration of the time the agencies were required to answer but never did.

8.     The *Bivens* claims are timely in that they were originally filed within three years of the date of accrual of each cause of action.

9.     The Prison Litigation Reform Act, 42 U.S.C. § 1997e, does not apply to this action in that Plaintiff had been released from prison prior to the filing of the initial complaint.

## VENUE

10.     Venue in this action is properly situated in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391 (b) and (e).

## PARTIES

11.     Plaintiff Joseph S. Barone is a natural person who, at the time of the commencement of this action, resided in New Rochelle, New York.

12.     Defendant Michael Gaeta is a natural person and was at all times material to this complaint, employed as a Special Agent to the FBI as a law enforcement officer, acting within the scope of his duties, in New York, New York and its vicinity.

13.     Defendant Gregory Miceli is a natural person and was at all times material to this complaint, employed as a Special Agent to the FBI as a law enforcement officer, acting within the scope of his duties, in New York, New York, and its vicinity.

14. Defendant Michael Trombetta is a natural person and was at all times material to this complaint, employed as a Special Agent to the FBI as a law enforcement officer, acting within the scope of his duties, in New York, New York, and its vicinity.

15. Defendant United States of America is the appropriate defendant under the Federal Tort Claims Act, and was at all times material to this complaint, the employer of defendants Gaeta, Miceli and Trombetta, and other agents of the FBI, the United States Attorney's Office and the Federal Bureau of Prisons.

### STATEMENT OF FACTS

16. On or about January 9, 2009, at approximately 1:00 pm, Plaintiff, while lawfully at his home, was suddenly wrongfully and falsely arrested and detained by the Defendants, and wrongfully and maliciously charged and prosecuted by the Defendants with a crime to commit murder for hire and conspiracy to commit murder.

17. Plaintiff was not guilty of the crimes charged, nor any other crime.

18. Each of the defendants knew, or came to learn immediately after Plaintiff's arrest and detention, that Plaintiff had committed no crime.

19. Yet, each of the defendants conspired with each other maliciously to cause the United States government to prosecute Plaintiff for those crimes which, the defendants knew, he did not commit.

20. On or about July 29, 2011, following a highly publicized trial, a federal jury acquitted Plaintiff of all the criminal charges against him.

21. As detailed further herein, the defendants' prosecution of Plaintiff was not for any legitimate law enforcement purpose but was solely to cause physical and

4

emotional injury to Plaintiff, to put him and his loved ones in danger of life and limb, without justification or legitimate excuse.

22.     This story began over twenty years ago, when Plaintiff began, in good faith, to serve the United States government as a cooperating witness and a confidential informant for the FBI in the violent underworld of organized crime.

23.     Plaintiff was literally born into an organized crime family, having been the son of a reputed member of "*La Cosa Nostra*" (LCN) in and around the New York area.  Plaintiff could have chosen that life for himself too.  Instead, he chose to serve the government.

24.     Plaintiff was accepted by the FBI, initially in approximately 1990 as a cooperating witness and, thereafter, as a confidential information.  Plaintiff became designated by the FBI as a top "Tier II" Confidential Informant.

25.     From the start, and throughout those long years, Plaintiff, at great personal risk to himself and his loved ones, gathered evidence and detailed information and provided it to the FBI in an effort to assist the government in taking down notorious and dangerous crime figures associated, *inter alia,* with the LCN.

26.     Over those many years, Plaintiff lived amongst these crime figures in the New York area, as a pretend mobster, holding himself out as one of them, earning their trust, and learning their secrets.

27.     As part of his service as a Confidential Informant, Plaintiff was expressly and indisputably authorized by the United States government to engage in so-called "criminal conversations" since Plaintiff's participation in these conversations was necessary to gather accurate information and to maintain his credibility with the subject

criminals. Plaintiff routinely engaged in "criminal conversations," with the full and complete knowledge, support and encouragement of the FBI.   Plaintiff regularly kept the FBI informed of the criminal activities of LCN subjects and their associates.

28.     Plaintiff's FBI "handler" from the beginning of Plaintiff's service as a Confidential Informant in or around 1990 was Special Agent Vincent "Vinnie" Presutti.   Upon information and belief, throughout Plaintiff's years of loyal service, Special Agent Presutti kept the identity of Plaintiff a secret, even from other government agents, in accordance with FBI policy.   Special Agent Presutti remained Plaintiff's exclusive FBI handler until in or around October 2008, a few months before Plaintiff's arrest when, upon information and belief, Presutti retired from the FBI.   Defendant Special Agent Michael Trombetta then became Plaintiff's new handler upon Agent Presutti's retirement.

29.     During Plaintiff's many years of service, the FBI prepared and maintained written progress reports, detailing Plaintiff's unblemished record of continuous service and valuable assistance to the government.   The FBI confirmed in those reports that information provided by Plaintiff was unique and highly valuable to the FBI.   These reports further confirm that Plaintiff's was very reliable and worthy of substantial remuneration, though Plaintiff only received a small amount over those 18 years solely to reimburse him for expenses.

30.     In one report dated December 5, 2005, for example, the FBI stated that Plaintiff helped the FBI identify 48 subjects of interest to the FBI and that Plaintiff kept the FBI abreast of the criminal activity of those close to Plaintiff.

31.     In another report dated November 21, 2008 prepared by defendant agent Michael Trombetta just six weeks prior to Plaintiff's arrest and imprisonment, the report stated that Plaintiff had provided information to the FBI over eighteen years and that Plaintiff's information has been reliable, timely and resulted in numerous arrests and convictions of violent criminal offenders.  This report further stated that Plaintiff's accomplishments were well documented and that Plaintiff has never been known to provide inaccurate information.

32.     In one case, which is undisputed, Plaintiff provided valuable information that prevented the murder of a sitting federal judge and an Assistant United States Attorney.

33.     According to the government's written evaluations of the Plaintiff's performance, the government had complete faith in Plaintiff's information and authorized him to gather information largely on his own, and using his own sources and methods; these methods were so effective and reliable that the government never required nor requested that Plaintiff wear "a wire" or use other such risky tactics to obtain and/or substantiate the information Plaintiff provided.

34.     Not once in Plaintiff's many years of service did the government complain about Plaintiff's methods of gathering and reporting information to his FBI handlers, often at great danger to Plaintiff's physical and financial well-being. Nowhere in the file of Plaintiff's approximately 18 years of service to the FBI through January 9, 2009, is there any indication that Plaintiff was ever disingenuous or unlawfully motivated.

35.     But, on January 9, 2009, while Plaintiff was still an active Confidential Informant, this very same government that, for 18 years, had encouraged Plaintiff, and benefitted from Plaintiff's services and dangerous undercover work, decided it was time to arrest, torture and otherwise punish Plaintiff to serve the personal interests of law enforcement agents.

36.     Upon information and belief, the FBI, including, in particular, defendants Miceli and Gaeta, saw an opportunity to go "Informant Shopping," i.e. for one agent to use the Confidential Informant developed by another agent for that agent's own personal benefit, and to further his advancement within the FBI.

37.     In this case, upon and information and belief, the FBI, including, in particular, defendants Miceli and Gaeta, decided to use Plaintiff's services to gather information on crime families in which Defendant Miceli was especially personally interested and focused, to further his career; in particular, members of the Gambino and Genovese crime families, two major New York crime families.  Though Plaintiff knew individuals within these families, he did not have especially close, long-term personal and trusted connections with them as he did, with other families, such as the Bonano family. Despite this, upon information and belief, defendants Miceli, Trombetta and Gaeta decided that they could use Plaintiff for their own personal benefit, including to advance their own personal careers within the FBI and thereafter for their own personal financial benefit, and to protect themselves from public embarrassment of having arrested and potentially blown the cover of one of the FBI's most, long term, trusted Confidential Informants, which would also reveal their incompetence.

38.    To serve these purposes, the FBI, including the individual defendants, Miceli, Gaeta and Trombetta, wanted Plaintiff to change his method of gathering information.  Under threat of prosecution on false, "trumped up" charges, and the disclosure of Plaintiff's status as a confidential informant to the public, the FBI agents ordered Plaintiff to make monitored telephone calls to crime figures of the Gambino and Genovese crime families, and other LCN members.

39.    Plaintiff wanted to assist the agents, as he done faithfully for 18 years, but tried to explain to the FBI agents that this new methodology would not only fail, but would compromise Plaintiff's identity and raise suspicions.  Plaintiff had never called these individuals on the telephone before, nor would he have in his pretend role as a mobster since experienced, high-level organized crime figures knew enough not to speak about something illegal over a "live" telephone wire which could be monitored by law enforcement.  The agents, however, insisted.

40.    Plaintiff's fears turned out to be precisely correct.  On a monitored telephone call with a notoriously violent member of the Gambino family, made at the behest of Defendants Miceli and Gaeta, the subject of the call told Plaintiff that the subject knew Plaintiff had been arrested, and that the subject believed that law enforcement were likely monitoring the call.

41.    Overwhelmingly fearful for his own personal safety and that of his family, Plaintiff declined to make any further monitored telephone calls.

42.    The defendants then made good on their threats by conspiring to leak, and outrageously leaking, Plaintiff's identity to the press and the public, and then

commencing a malicious prosecuting against Plaintiff on bogus charges of murder for hire and conspiracy, crimes they knew he did not commit.

43.     The government's foundation to bring bogus charges against Plaintiff allegedly came from information provided to the government by Michael Cooks, a notoriously unscrupulous individual purportedly working in or around November 2008 as an informant for the New York City Police Department (NYPD).

44.     According to federal agents and NYPD testimony, the investigation that served as the sole basis to prosecute Plaintiff lasted a total of three (3) days, the third day being the day on which Plaintiff was arrested.

45.     The government's bogus theory on which to prosecute Plaintiff was that Plaintiff was approached by one of Plaintiff's acquaintances called Tony Piliero, to have Plaintiff arrange for the murder of a former employee of Piliero's in Connecticut allegedly so that Piliero could collect insurance money.

46.     According to the testimony of Cooks, who admitted during trial to having an extensive and violent criminal background, including shooting people, Cooks had been commissioned by Plaintiff to travel to Connecticut for the purpose of gathering information on an individual to be murdered by Cooks, supposedly for Plaintiff.

47.     In late summer or early fall of 2008, Cooks had travelled to Connecticut and made a video recording of the residence of the would-be victim.  Cooks then showed the videotape to Plaintiff who, in turn, explained to Cooks that it would be impossible to "do the job."

48.     In reality, Plaintiff never had any intention to commit such a crime, nor even to allow such a crime to be committed by others.   Plaintiffs conversations with

Cooks and Piliero, like the numerous "criminal conversations" Plaintiff had in his 18 years as a confidential informant, were authorized by the FBI as part of Plaintiff's pretend, undercover role as a mobster.  Plaintiff did not believe that Piliero actually intended for Plaintiff to arrange for someone's murder.  And, at no time did Plaintiff believe that Cooks was going to actually commit a murder.

49.     The defendants were acutely aware that, in this instance, Plaintiff was just playing his pretend mobster role, had no intention to engage in a murder plot, since, many years earlier, Plaintiff had provided information to the FBI about this same or similar plot, and the FBI did not take any action because there was never a real threat and, upon information and belief, the FBI did not believe a crime had been committed, or was about to be committed.

50.     In or around late December 1999, Plaintiff specifically advised his handler, Special Agent Vinnie Presutti, that Piliero had approached Plaintiff about arranging a murder for hire on two individuals, one of which reportedly lived in Connecticut.  Plaintiff knew Piliero and had strong doubts about the sincerity of Piliero's intentions, and told that to Special Agent Presutti.

51.     According to the contemporaneous report prepared by Special Agent Presutti in January 2000, Plaintiff specifically told the FBI that he was "uncertain about the sincerity" of Piliero's request.  Plaintiff further specifically told the FBI that, to test the seriousness of Piliero's request, Plaintiff had told Piliero to make fifty thousand dollars available, and contact Plaintiff, after which Plaintiff would introduce Piliero to someone who would fulfill Piliero's request.

11

52.     Subsequent to this report, Piliero did not come up with any money to arrange any hit and, until the events leading up to Plaintiff's arrest in 2009, Piliero did not further discuss arranging any murders, or any other crimes, with Plaintiff.  At no time did Plaintiff believe that Piliero was seriously attempting to cause Plaintiff to arrange a murder.  The FBI also took no further action on the information about Piliero provided by Plaintiff because, the FBI too, did not believe Piliero had committed a crime, or seriously intended to commit a crime, or represented a serious threat to anyone.

53.     Yet, in 2008, many months after Plaintiff told Cooks that the proposed hit was "impossible," as Plaintiff had done in other instances to prevent an actual crime from occurring, the government and the NYPD, in their overzealous effort to make a case against Plaintiff, took their first step in bad faith against Plaintiff and worked out a deal with Cooks and the NYPD to entrap Plaintiff who was still an active and effective Tier II Confidential Informant.

54.     In early January 2009, Cooks, at the direction of the FBI and the NYPD, initiated contact again with Plaintiff in order to engage him in a taped telephone conversation to elicit incriminating statements about the previous purported murder plot.

55.     In accordance with the FBI and NYPD direction, Cooks stated to Plaintiff that Cooks had found someone to commit the murder and that Cooks needed money urgently and a handgun from Plaintiff for the job.  The FBI and NYPD strategy was for Cooks to present a sound plan for reviving and carrying out the murder which Plaintiff had earlier told Cooks was impossible.

56.     Again, Plaintiff did not take Cooks seriously and, in any event, had no intention to allow a murder to be committed.  While Plaintiff indulged Cooks in these

conversations, as Plaintiff was at all relevant times authorized by the FBI to do, Plaintiff made no effort to assist Cooks in carrying out a murder and, in fact, Plaintiff again attempted to thwart Cooks' efforts to carry out the supposed murder.  Plaintiff did not give Cooks the handgun or the money Cooks had requested despite both items being readily available to Plaintiff.

57.     Despite these facts, known to the FBI agents, obviously exculpating Plaintiff from criminal wrongdoing, the federal agents, including the individual defendants, decided to falsely arrest and maliciously prosecute him.  Upon information and belief, Defendants did not obtain an arrest warrant, nor did they make any effort to do so, knowing they did not have sufficient probable cause to make the arrest.

58.     Instead, on January 9, 2009, upon Plaintiff's return from a mundane trip to the grocery store with his girlfriend, clearly not engaged in any murder plot, and presenting no threat to others, a task force including the individual defendants, other agents of the FBI, the NYPD and ICE stormed in upon his home and property without a warrant, and arrested Plaintiff in his driveway, creating a likelihood of a neighborhood spectacle.

59.     Plaintiff was transported to the Metropolitan Detention Center in Brooklyn, New York.  While there, under the direction of the FBI, he was thrown into the Special Housing Unit (SHU) of the jail and remained incommunicado for 19 months with little to no access to the telephone, proper medical care, commissary, socialization and recreational activities.

60.     From at least the time of Plaintiff's arrest, and all relevant times thereafter, the defendants, including the individual defendants, Gaeta, Miceli and Trombetta knew (a) that Plaintiff was an active Tier II Confidential Informant to the FBI, (b) that Plaintiff had loyally and valiantly served the FBI in that capacity for approximately 18 years, including on the day of his arrest and thereafter (c) that Plaintiff was expressly authorized as such by the FBI to engage in criminal conversations, including the conversations for which Plaintiff was falsely arrested and charged, (d) that Plaintiff had, in fact, engaged in authorized criminal conversations throughout those many years which resulted in Plaintiff providing valuable information to the FBI, leading the arrests and convictions of violent criminals, (e) that Plaintiff had not, in all his years as an informant, himself engaged in violence, and (f) that defendants had information that Plaintiff had not committed a crime; (g) that defendants could not evince any facts or circumstances which could lead a reasonable prudent person to believe that Plaintiff was guilty of a crime and (h) that Plaintiff was, in fact, innocent of the crimes of which he was accused and ultimately charged including murder for hire, and conspiracy to commit murder.

61.     Upon information and belief, following Plaintiff's refusal to engage in high risk monitored telephone calls, the Defendants conspired to, and did intentionally, outrageously and in bad faith, leak to the press Plaintiff's identity as an FBI "informant' thereafter placing his life in imminent physical danger whether inside and outside the prison, causing him severe physical and emotional distress, as well as endangering the lives and health of Plaintiff's loved ones.

62.     Upon information and belief, following Plaintiff's refusal to engage in high risk monitored telephone calls, and in furtherance of their scheme to injure Plaintiff, and solely for that purpose, the defendants, including the individual defendants, in bad faith directed agents of the Bureau of Prisons to place Plaintiff into a Special Housing Unit (SHU), where Plaintiff suffered severe physical and emotional injuries and trauma including without limitation, multiple and permanently disfiguring and painful staph infections, and Post Traumatic Stress Disorder.

63.     Upon information and belief, following Plaintiff's refusal to engage in high risk monitored telephone calls, and in furtherance of their scheme to injure Plaintiff, and solely for that purpose, the defendants in bad faith and maliciously empaneled a grand jury for the purposes of obtaining an indictment against Plaintiff, on false pretenses, and without probable cause, solely for the malicious purpose of causing injury to Plaintiff.

64.     Upon information and belief, the individual defendants Gaeta, Miceli and Trombetta, along with other agents of the FBI and the NYPD, conspired to, and did, in bad faith, cause the Grand Jury proceeding to be commenced against Plaintiff by *inter alia* withholding critical, exculpatory facts concerning Plaintiff in bad faith from the federal prosecutors, and by giving false statements to the federal prosecutors concerning Plaintiff's guilt.

65.     Upon information and belief, the defendants, conspired to, and did, provide false and misleading testimony to the Grand Jury for the purpose of causing the Grand Jury to return an indictment without probable cause, in bad faith and on false premises.

66.     Upon information and belief, the defendants conspired to, and did, intentionally and in bad faith withhold critical exculpatory evidence from the Grand Jury for the purpose of causing the Grand Jury to return an indictment without probable cause, and on false premises.

67.     Specifically, upon information and belief, the government failed to offer to the grand jury the critical exculpatory testimony of Special Agent Vincent Presutti, who was Plaintiff's exclusive and confidential FBI "handler" from the beginning of Plaintiff's service to the FBI in approximately 1990 as a confidential informant through the date of Agent Presutti's retirement in approximately October 2008, a few months before Plaintiff's arrest.

68.     Without the testimony of Agent Presutti, the government could not have presented to the grand jury, critical exculpatory evidence including Presutti's written reports, over 18 years, concerning Plaintiff's valued service to the FBI including, but not limited to, Presutti's January 2000 report wherein Plaintiff informed the FBI specifically that Piliero had approached him for a murder for hire plot, and that neither Plaintiff nor the FBI took the plot seriously.

69.     Upon information and belief, upon information and belief, the government further did even not offer to the grand jury the testimony of defendant Trombetta, who became Plaintiff's "handler" following Special Agent Presutti's retirement.

70.     Plaintiff is informed and believes therefore, that the Grand Jury, heard no testimony about, and received no evidence of, Plaintiff's long history of service to the FBI as a confidential informant, nor any evidence that Plaintiff was authorized by

the United States government to work undercover as a pretend mobster, and to participate in "criminal conversations," for which he was ultimately wrongfully charged and prosecuted.

71.     Plaintiff is informed and believes that neither Agents Presutti nor Agent Trombetta testified before the Grand Jury on the basis that the government called both of these witnesses at Plaintiff's criminal trial, but did not turn over grand jury testimony for these witnesses as they would have been required to do under the Jencks Act, 18 U.S.C. § 3500, or under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny.

72.     Upon information and belief, the government instead offered to the grand jury only the testimony of defendant Special Agent Michael Gaeta who only became aware of Plaintiff's status as a Tier II FBI Confidential Informant just days before Plaintiff's arrest.  Agent Gaeta was not aware that Plaintiff had loyally and valuably served in that role for over eighteen years.  Agent Gaeta could not have testified as to the highly exculpatory details of Plaintiff's undisputed valuable service, demonstrating Plaintiff's innocence and essential to Plaintiff's defense that he was authorized by the United States government to act like a mobster, and engage in criminal conversations.

73.     Upon information and belief, Agent Gaeta and other Grand Jury witnesses, in bad faith, gave false and/or misleading testimony to the grand jury, just as Agent Gaeta, and other government witnesses gave false and misleading testimony to the court with respect to the circumstances surrounding Plaintiff's arrest in connection with a suppression hearing at Plaintiff's criminal trial.

74.     Upon information and belief, prosecutors later and in bad faith strategically declined to call Agent Gaeta and other grand jury witnesses to testify at Plaintiff's criminal trial, knowing that Agent Gaeta these other grand jury witnesses had offered misleading testimony to the grand jury, and that the government would have to turn over this grand jury testimony under 18 U.S.C. § 3500.

75.     Upon information and belief, the government failed to present to the grand jury that (a) that Plaintiff was an active Tier II Confidential Informant to the FBI, (b) that Plaintiff had loyally and valiantly served the FBI in that capacity for approximately 19 years, including on the day of his arrest and thereafter (c) that Plaintiff was expressly authorized as such by the FBI to engage in criminal conversations, including the conversations for which Plaintiff was falsely arrested and charged, and (d) that Plaintiff had, in fact, engaged in authorized criminal conversations throughout those many years which resulted in Plaintiff providing valuable information to the FBI, leading the arrests and convictions of violent criminals, (e) that Plaintiff had not, in all his years as an informant, himself engaged in violence, and (f) that Plaintiff was, in fact, innocent of the crimes of which he was accused and ultimately charged including murder for hire, and conspiracy to commit murder.

76.     In October 2009, the Grand Jury returned an indictment against Plaintiff, which included false charges of Murder for Hire and Conspiracy, and  a weapons charge.  Upon information and belief, had defendants not misled the Grand Jury by withholding critical exculpatory information and by providing false testimony, the Grand Jury would not have returned an indictment against Plaintiff.

77.     Having wrongfully obtained the indictment based on false and/or misleading testimony, the defendants then maliciously prosecuted Plaintiff for Conspiracy for Murder, and Conspiracy to Commit Murder for Hire. *See United States v. Joseph S. Barone*, Case No. 09-CR-91 (NRB).

78.     Following the trial with co-defendant Piliero in which Plaintiff himself testified, the jury acquitted Plaintiff of the charge of Murder for Hire and failed to reach a verdict on the conspiracy charge.  Following Plaintiff's acquittal, the United States government abandoned all remaining charges.

79.     During the pretrial suppression hearing, prosecution witnesses including Defendant Gaeta, provided false and misleading testimony to the court, for the ultimate purpose of causing the court to convict Plaintiff on bogus charges.  In fact, Agent Gaeta's veracity (along with the veracity of his other testifying FBI and NYPD cohorts) was expressly called into question by the trial judge, the Honorable Naomi R. Buchwald, who found the agents' testimony offered at a suppression hearing collectively to be unreliable at best, if not outright false, and granted Plaintiff's motion to suppress evidence on June 25, 2010.

80.     During the trial, prosecution witnesses including defendants Trombetta and Miceli provided false, misleading and evasive testimony to the court and to the jury, for the ultimate purpose of causing the court to convict Plaintiff on bogus charges.

81.     During defendant Trombetta's trial testimony, for example, he misleadingly downplayed Plaintiff's years of service to the FBI, and testified

misleadingly that Plaintiff was not authorized by the FBI to engage in criminal conversations.

82.     Defendant Miceli, during his trial testimony, intentionally offered evasive and misleading testimony concerning Plaintiff's cooperation, and the FBI's reckless attitude towards Plaintiff's safety and security, in demanding that he make highly risky monitored telephone calls to the Gambino and Genovese crime family members.  For example, during his testimony, Defendant Miceli falsely denied that Plaintiff's monitored telephone call with a Gambino family member had gone horribly wrong because Plaintiff's cover may have been blown to the notoriously violent gangster.

83.     Upon information and belief, prosecutors and government witnesses were told to "downplay" falsely to the jury Plaintiff's cooperation, and his undisputed long record of cooperation and valuable service to the FBI.

84.     Upon information and belief, the United States, through its agents at the Department of Justice, and in furtherance of their scheme to injure Plaintiff, paid the NYPD's troubled informant Michael Cooks, for his testimony, and for wrongfully setting up Plaintiff, giving Cooks approximately $2,000 per month for at least the time during which Plaintiff was awaiting trial, totaling at least $38,000.

85.     While awaiting trial, Plaintiff was incarcerated at the Metropolitan Detention Center (MDC), a facility operated by the Federal Bureau of Prisons (BOP), in Brooklyn, New York from the time shortly after Plaintiff's arrest in early 2009 until just before his trial in or around July 2010, whereupon he was moved to the Metropolitan Correctional Center (MCC) in Manhattan.

86.     From approximately May 2009, through the date he was moved to the MCC, Plaintiff was incarcerated in a "Special Housing Unit" (SHU) of the MDC.

87.     Upon information and belief, Plaintiff was taken out of general population, put into the SHU, and held there indefinitely and arbitrarily for approximately fifteen months, specifically at the direction and request of law enforcement officers including Defendants Gaeta, Miceli and Trombetta, in violation of BOP Policies and Procedures.

88.     Plaintiff was not thrown into the SHU for disciplinary reasons, nor did Plaintiff otherwise meet the standard for continuous segregation in the SHU according to BOP Policies and Procedures.

89.     Upon information and belief, Defendants Gaeta, Miceli and Trombetta ordered BOP officers to incarcerate Plaintiff in the SHU, against his will, solely to further their malicious scheme to punish him for refusing to cooperate, and not for any legitimate concern over Plaintiff's safety or wellbeing.

90.     Upon information and belief, to the extent there were conditions in the general population at the MDC potentially threatening Plaintiff's life or safety, Defendants Gaeta, Miceli and Trombetta intentionally caused those conditions by wrongfully and outrageously conspiring to leak, and leaking Plaintiff's identity and status as a mob informant to the press, solely for the purpose of punishing him for his refusal to cooperate.

91.     Upon information and belief, had Defendants Gaeta, Miceli and Trombetta not ordered BOP officials to place Plaintiff in the SHU, Plaintiff would not have been placed into the SHU at the MDC.

92.     At all times during the period of time in which Plaintiff was incarcerated in the SHU at the MDC, Plaintiff and/or his counsel consistently objected to no avail to Plaintiff's segregation in the SHU, and requested that Plaintiff be returned to the general population, consistent with BOP policies and procedures.

**FIRST CAUSE OF ACTION**
**AGAINST THE UNITED STATES PURSUANT TO THE FTCA**
**(Malicious Prosecution)**

93.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 92 above, with same force and effect as if fully set forth herein.

94.     At all relevant times, agents Gaeta, Miceli and Trombetta, were agents of the United States, and acting within the scope of their duties as law enforcement officers.

95.     The United States, through its agents Gaeta, Miceli and Trombetta, maliciously initiated and continued a criminal proceeding against Plaintiff, in bad faith and without probable cause.

96.     The criminal proceeding terminated completely in Plaintiff's favor no earlier than September 17, 2010 with a jury verdict of acquittal, followed by the government's abandonment of any remaining charges against Plaintiff, all of which is not inconsistent with Plaintiff's innocence.

97.     The United States lacked probable cause to commence and to continue the criminal proceeding against Plaintiff since, at all relevant times, the United States, including agents Gaeta, Miceli and Trombetta, knew, or possessed information, that Plaintiff had committed no crimes, and that defendants could not evince any facts or

circumstances which could lead a reasonable person to believe that Plaintiff was guilty of the crimes charged.

98.    The United States lacked probable cause to commence and to continue the criminal prosecution against Plaintiff since the indictment was procured from the Grand Jury by fraud, false or misleading testimony, suppression of evidence and other law enforcement misconduct, as detailed herein.

99.    Defendants Gaeta, Miceli and Trombetta, at all relevant times, were motivated by actual malice in that Defendants Gaeta, Miceli and Trombetta desired to injure Plaintiff solely due to defendants' personal animus towards Plaintiff, because Plaintiff would not place his own life in imminent danger to assist defendants for their own personal benefit.

100.    Defendants Gaeta, Miceli and Trombetta conspired to, and did, play an active role in the prosecution of Plaintiff, including advising, encouraging and importuning federal prosecutors to act, including by withholding relevant and material information from prosecutors and the court, including highly exculpatory evidence of Plaintiff's innocence, prior to and subsequent to the indictment, and by creating and providing to prosecutors and to the court, false information calculated, and likely, to influence a jury's decision, prior to and subsequent to the indictment.

101.    At all relevant times, the defendants' actions were motivated by bad faith, actual malice, and were not justified, excused or privileged.

102.    Plaintiff suffered severe damages as a result of defendants' misconduct including, but not limited to, loss of his liberty, loss of income, loss of his

future livelihood, economic losses including costs of his defense, loss of consortium, reputational damages, emotional distress, physical injuries, and other pain and suffering.

103. The United States is liable for these damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
## AGAINST THE UNITED STATES PURSUANT TO THE FTCA
### (Intentional Infliction of Emotional Distress)

104. Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 103 above, with same force and effect as if fully set forth herein.

105. Defendants Gaeta, Miceli and Trombetta, acting within the scope of their duties as law enforcement officers of the United States, conspired to, and did, engage in extreme and outrageous conduct, including, but not limited to, (a) forcing Plaintiff to place himself in imminent danger to his life and health by knowingly forcing him with threats of false arrest, imprisonment and prosecution, to expose his role as an FBI cooperator to notoriously violent organized crime figures, (b) intentionally leaking Plaintiff's identity and role as a long time FBI confidential informant to the press and public, knowingly placing Plaintiff's life, and the lives of his loved ones, in imminent danger, and destroying his life and livelihood, (c) causing a criminal prosecution to be commenced and maintained against Plaintiff based on false and misleading evidence and testimony, and withholding highly exculpatory evidence from federal prosecutors and the court, (d) intentionally causing Plaintiff to be incarcerated for approximately 15 months in a Special Housing Unit of the Metropolitan Detention Center, to deprive Plaintiff of basic rights and services normally afforded to prisoners in the general population, and

intentionally, and in bad faith, creating the dangerous circumstances where such segregation could be justified.

106.    The conduct of Defendants Gaeta, Miceli and Trombetta is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and is to be regarded as atrocious and utterly intolerable in a civilized society.

107.    Defendants Gaeta, Miceli and Trombetta intended to cause Plaintiff severe emotional distress, or acted in disregard of the substantial possibility of causing severe emotional distress.

108.    Defendants Gaeta, Miceli and Trombetta, through their extreme and outrageous conduct, did cause severe emotional distress to Plaintiff, including long lasting emotional injuries requiring medical treatment for Post-Traumatic Stress Disorder.

109.    At all relevant times, the defendants' actions were motivated by bad faith, actual malice, and were not justified, excused or privileged.

110.    The United States is liable for these damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### AGAINST THE UNITED STATES PURSUANT TO THE FTCA
#### (Negligent Infliction of Emotional Distress In The Alternative)

111.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 110 above, with same force and effect as if fully set forth herein.

112.    Plaintiff was undisputedly a long term, valued cooperating witness and confidential informant to the FBI from approximately 1990 through and exceeding the date of his arrest in 2009, in the extremely violent and dangerous sphere of organized crime in the New York area.

113.    Given the extreme and violent nature of the organized crime underworld in which Plaintiff served the United States, the exposure of Plaintiff's status as a cooperator or FBI Confidential Informant would place his life and safety in imminent danger including due to, among other things, retribution from members of the subject organized crime families on whom Plaintiff was providing information.

114.    Throughout that period as a long term Confidential Informant and cooperating witness, and continuing thereafter, the United States government owed a direct duty to Plaintiff, to protect him from physical harm and, in particular, to keep his identity and status as a confidential informant and cooperator a secret.

115.    In breach of this duty, agents of the United States, including but not limited to, defendants Gaeta, Miceli and Trombetta, intentionally or negligently exposed Plaintiff's identity and role as a confidential informant and cooperator to public by leaking this information to the press and to the public, by commencing a sensationalized criminal trial against him without probable cause and based on false or misleading evidence and testimony.

116.    These acts and/or omissions of agents of the United States unreasonably endangered Plaintiff's physical safety and caused Plaintiff reasonably to fear for his own safety.

117.    As a proximate result of the acts and/or omissions of the agents of the United States unreasonably endangering Plaintiff's physical safety and causing Plaintiff reasonable fear for his own safety, Plaintiff suffered severe emotional distress, including long term emotional injuries requiring treatment for Post-Traumatic Stress Disorder, along with other physical injuries.

118.    The United States is liable for these damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
## AGAINST THE UNITED STATES PURSUANT TO THE FTCA
### (New York *Prima Facie* Tort In The Alternative)

119.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 118 above, with same force and effect as if fully set forth herein.

120.    Defendants Gaeta, Miceli and Trombetta, along with other agents of the United States acting within the scope of their duties as law enforcement officers and agents of the United States, conspired to, and did, intentionally inflict harm on Plaintiff by (a) forcing Plaintiff to place himself in imminent danger to his life and health by knowingly forcing him with threats of false arrest, imprisonment and prosecution, to expose his role as an FBI cooperator to notoriously violent organized crime figures, (b) intentionally leaking Plaintiff's identity and role as a long time FBI confidential informant to the press and public, knowingly placing Plaintiff's life, and the lives of his loved ones, in imminent danger, and destroying his life and livelihood, (c) causing a criminal prosecution to be commenced and maintained against Plaintiff based on false and misleading evidence and testimony, and withholding highly exculpatory evidence from federal prosecutors and the court, (d) intentionally causing Plaintiff to be incarcerated for approximately 15 months in a Special Housing Unit of the Metropolitan Detention Center, to deprive Plaintiff of basic rights and services normally afforded to prisoners in the general population, and intentionally, and in bad faith, creating the dangerous circumstances where such segregation could be justified.

121.    At all relevant times, the defendants' actions were motivated by bad faith and actual malice against Plaintiff, and were not justified, excused or privileged.

122.    Plaintiff suffered specific and measurable losses as a proximate result of defendants' actions which include, without limitation, the cost of his legal defense from the date of his arrest through the present, the virtual destruction of his life and livelihood from the time of his arrest to the present, including the loss of his home, and out of pocket medical expenses.

123.    These losses include, without limitation, at least (a) legal defense costs in the amount of at least $415,000.00; (b) the reasonable value or lost income from the time of his unlawful initial incarceration through the present (approximately 5 ½ years) valued at not less than $825,000.00; (c) the value of Plaintiff's equity in his former home not less than $500,000, which home Plaintiff was forced to sell in a depressed market solely to escape mob retribution against him; and (d) Plaintiff's out-of-pocket medical expenses to treat his physical and emotional injuries in the amount of at least $4000.00.

124.    Plaintiff suffered additional damages, including loss of liberty, pain and suffering, and emotional distress, and additional legal fees, as a proximate result of defendants' actions in an amount to be determined at trial.

125.    The United States is liable for these damages in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**AGAINST THE UNITED STATES PURSUANT TO THE FTCA**
**(Negligence)**

126.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 125 above, with same force and effect as if fully set forth herein.

127.   Plaintiff was incarcerated, while awaiting trial, at the Metropolitan Detention Center (MDC), a facility operated by the Federal Bureau of Prisons (BOP), in Brooklyn, New York from the time of Plaintiff's from shortly after his arrest in early 2009 until just before his trial in or around July 2010, whereupon he was moved to the Metropolitan Correctional Center (MCC) in Manhattan.

128.   From approximately May 2009, through the date he was moved to the MCC, Plaintiff was incarcerated in a "Special Housing Unit" (SHU) of the MDC.

129.   Plaintiff was taken out of general population, put into the SHU, and held there indefinitely and arbitrarily, specifically, upon information and belief, at the direction and request of law enforcement officers including Defendants Gaeta, Miceli and Trombetta, and against BOP Policies and Procedures.

130.   At all times during the period of time in which Plaintiff was segregated in the SHU at the MDC, Plaintiff consistently objected to his placement in the SHU, and requested that he be returned to the general population, consistent with BOP policies and procedures.

131.    During the period of time in which Plaintiff was incarcerated, in the custody of the United States, and awaiting trial, the United States, including BOP agents, and defendants Gaeta, Miceli and Trombetta, had a duty to provide for Plaintiff's health and security, to furnish Plaintiff with sanitary conditions, to provide him

reasonable medical care and treatment, and all other BOP duties as set forth in 18 U.S.C. §4042(a).

132.    During the period of time in which Plaintiff was incarcerated, in the custody of the United States, and awaiting trial, the United States, acting through its BOP agents and FBI agents, negligently breached its duties to Plaintiff, by *inter alia* failing to furnish sanitary conditions within the facility, by failing to provide him adequate medical care and treatment, and by failing to provide adequately for Plaintiff's health and security.

133.    As a proximate result of the negligent acts and omissions of the United States, acting through its BOP agents and FBI agents, Plaintiff suffered severe trauma, physical injury, severe pain and suffering including, but not limited to, three separate staph infections requiring excision, which has led to reoccurring infections such as folliculitis, eye, ear, nose and throat infections, oral infections, as well as chronic insomnia combined with persistent and constant migraines.

134.    As a proximate result of the negligent acts and omissions of the United States, acting through its BOP agents and FBI agents, Plaintiff was diagnosed with, and suffered "acute stress reaction" causing irregular heartbeats, the treatment of which required continued psychiatric medical care, including medication for Post-Traumatic Stress Disorder (PTSD).

135.    As a result of the negligence of the United States, acting through its BOP agents and FBI agents, Plaintiff has suffered damages, in an amount to be determined at trial.

**SIXTH CAUSE OF ACTION**
**AGAINST DEFENDANTS GAETA, MICELI AND TROMBETTA**
**PURSUANT TO *BIVENS v. SIX UNKNOWN AGENTS* and its progeny**
**(Malicious Prosecution in violation of Plaintiff's *Fourth and Fifth Amendment***
**Rights)**

136.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 135 above, with same force and effect as if fully set forth herein.

137.    At all relevant times, defendants Gaeta, Miceli and Trombetta were law enforcement officers and agents of the United States government and the Federal Bureau of Investigation.

138.    Defendants Gaeta, Miceli and Trombetta conspired to, and did maliciously initiate and continue a criminal proceeding against Plaintiff, in bad faith and without probable cause, in violation of Plaintiff's rights pursuant to the Fourth and Fifth Amendments to the United States Constitution.

139.    The criminal proceeding terminated in Plaintiff's favor with a jury verdict of acquittal, followed by the government's abandonment of any remaining charges against Plaintiff, all of which is not inconsistent with Plaintiff's innocence.

140.    Each of defendants Gaeta, Miceli and Trombetta lacked probable cause to commence and to continue the criminal proceeding against Plaintiff since, at all relevant times, defendants Gaeta, Miceli and Trombetta, knew, or possessed information, that Plaintiff had committed no crimes, and that defendants could not evince any facts or circumstances which could lead a reasonable person to believe that Plaintiff was guilty of the crimes charged.

141.    Defendants Gaeta, Miceli and Trombetta procured the Grand Jury indictment by fraud, false or misleading testimony, suppression of evidence and other misconduct, as detailed herein.

142.    Defendants Gaeta, Miceli and Trombetta, at all relevant times, were motivated by actual malice against Plaintiff in that Defendants Gaeta, Miceli and Trombetta desired to injure Plaintiff solely due to defendants' personal animus towards Plaintiff, because Plaintiff would not place his own life in imminent danger to assist defendants for their own personal benefit.

143.    Defendants Gaeta, Miceli and Trombetta conspired to, and did, play an active role in the prosecution of Plaintiff, including advising, encouraging and importuning federal prosecutors to act, including by withholding relevant and material information from prosecutors and the court, including highly exculpatory evidence of Plaintiff's innocence, prior to and subsequent to the indictment, and by creating and providing to prosecutors and to the court, false information calculated, and likely, to influence a jury's decision, prior to and subsequent to the indictment.

144.    At all relevant times, the defendants' actions were motivated by bad faith, actual malice against Plaintiff, and were not justified, excused or privileged.

145.    Plaintiff suffered severe damages as a result of defendants' misconduct including, but not limited to, loss of his liberty, loss of income, loss of his future livelihood, economic losses including costs of his defense, loss of consortium, reputational damages, emotional distress, physical injuries, and other pain and suffering.

146.    Defendants Gaeta, Miceli and Trombetta are jointly and severally personally liable for these damages, in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**
**AGAINST DEFENDANTS GAETA, MICELI AND TROMBETTA**
**PURSUANT TO *BIVENS v. SIX UNKNOWN AGENTS* and its progeny**
**(Deprivation of Life & Liberty without Due Process in violation of Plaintiff's *Fifth***
**and *Eighth Amendment* Rights)**

147.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 146 above, with same force and effect as if fully set forth herein.

148.    Defendants Gaeta, Miceli and Trombetta conspired to, and did physically and emotionally torture Plaintiff and cause Plaintiff to be deprived of his liberty without due process of law, in violation of Plaintiff's rights pursuant to the Fifth and Eighth Amendments to the United States Constitution.

149.    Defendants Gaeta, Miceli and Trombetta conspired to, and did, in bad faith and with actual malice, direct agents of the Federal Bureau of Prisons to move Plaintiff, against his will, from the general population of the Metropolitan Detention Center in Brooklyn, New York, to a "Special Housing Unit" (SHU) in the facility.

150.    Agents of the BOP complied with the directions of defendants Gaeta, Miceli and Trombetta, and in breach of BOP Policies and Procedures, Plaintiff was held, against his will, in the SHU from approximately May 2009 through approximately July 2010, when his trial began.

151.    Throughout this period, Plaintiff did not meet the standard for segregation in the SHU according to BOP policies and procedures, had committed no crime or disciplinary infraction, and should not have been so segregated.

152.    Plaintiff was thrown into the SHU, and deprived of basic essential services and comforts, by defendants Gaeta, Miceli and Trombetta, in bad faith and solely for their own punitive purposes, and not for any legitimate purposes.

33

153.    At the direction of defendants Gaeta, Miceli and Trombetta, throughout this period, Plaintiff was not afforded a hearing with respect to his segregation which was a violation of BOP Policies and Procedures, and Plaintiff's due process rights under the Fifth and Eighth Amendments to the Constitution.

154.    As a result of the actions of defendants Gaeta, Miceli and Trombetta, Plaintiff was unlawfully, in bad faith, without justification, and without due process, deprived of his basic and common rights and privileges, including access to proper medical care, use of a telephone, access to a library, commissary, visitation, and other social and recreational activities, in addition to other deprivations and injuries.

155.    As a result of the actions of defendants Gaeta, Miceli and Trombetta, Plaintiff was deprived of his rights pursuant to the Fifth and Eighth Amendments to the Constitution.

156.    Defendants Gaeta, Miceli and Trombetta are jointly and severally liable to the Plaintiff for damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

157.    **WHEREFORE**, Plaintiff demands judgment against each of the Defendants, jointly and severally, in compensatory and all other damages caused by Defendants' acts and omissions in at least the following amounts, and which amounts will be proven in detail at trial of this action:

a. Lost earnings,
b. Personal suffering humiliation and emotional distress, illness and permanent scarring;
c. Uncompromising and perpetual decrease in quality of life due to imminent danger of death or serious injury to Plaintiff and his loved ones;
d. An amount adequate to compensate Plaintiff for defense costs incurred during the investigation and trial;

e.  In order to deter defendants and other from engaging in such unlawful and unconstitutional activities, Plaintiffs further requests punitive damages against each individual defendant, plus costs and attorney's fees; and

f.  Such other and further relief as the Court may deem just and equitable, for a total amount of 20 million dollars or as determined by the Court; and

g.  Such other relief as Plaintiff may be entitled.

## DEMAND FOR JURY TRIAL

158.  Plaintiff hereby demands a trial by jury of all issues so triable in this Action.

Dated: New York, New York
October 10, 2014

Respectfully submitted,

HERZFELD & RUBIN, P.C.

By: _____

Mark A. Weissman
Lawton W. Squires
125 Broad Street
New York, New York 10004
(212) 471-8500