UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSEPH S. BARONE,

                           Plaintiff,

                    -against-

UNITED STATES OF AMERICA, SPECIAL
AGENTS MICHAEL GAETA, GREGORY MICELI
and MICHAEL TROMBETTA in their official
capacities as agents of the Federal Bureau of
Investigation and in their individual capacities,

                          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12 Civ. 4103 (AJP)

**OPINION & ORDER**

**ANDREW J. PECK, United States Magistrate Judge:**

        Plaintiff Joseph Barone brought this Bivens action against defendants arising out of his alleged malicious prosecution in connection with a murder for hire plot. Presently before the Court is defendants' summary judgment motion. (Dkt. No. 114.) The parties have consented to decision of the motion by a Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Dkt. No. 122.) For the reasons set forth below, defendants' motion is GRANTED.

## FACTS

### Barone's Beginnings As An FBI Informant

        Barone spent his childhood in Westchester County, New York, with his "father, Joseph A. Barone, Sr., [who] was a made member of the Genovese crime family." (Dkt. No. 128: Barone Aff. ¶¶ 3, 7.) Through his father, Barone made numerous contacts within the Italian mafia or La Cosa Nostra ("LCN") and "was generally thought to be associated with the LCN" as a young man. (Barone Aff. ¶ 7.) "In those days," Barone states, he "occasionally participated in illegitimate

or illegal enterprises, primarily in the nature of financial schemes, such as insurance scams and 'loan sharking.'" (Id.)

In 1991, Barone was indicted in the Southern District of New York on weapons and extortion charges. (Barone Aff. ¶ 8; Dkt. No. 120: Def. Rule 56.1 Stmt. ¶ 1; Dkt. No. 129: Barone Rule 56.1 Stmt. ¶ 1.) Barone met FBI Special Agent Vincent Presutti while incarcerated on the 1991 charges. (Barone Aff. ¶ 8; Def. & Barone Rule 56.1 Stmts. ¶ 2.) Agent Presutti convinced Barone to work for the FBI as a "'cooperating witness'" ("CW")–an FBI designation for someone "who had agreed to provide testimony in a court case and who might gather evidence against a target in anticipation of testifying against that target in the future"–and was officially "'opened'" as a CW in early 1993. (Barone Aff. ¶ 8; Def. & Barone Rule 56.1 Stmts. ¶¶ 3-5.) Barone was released from prison on January 20, 1995 and informed Agent Presutti that he would continue to provide information to the FBI; however, because Barone's testimony against other targets was no longer needed, "he was converted from a CW to a" confidential informant ("CI"), which, in contrast to a CW, designates an individual who has not agreed to provide testimony. (Dkt. No. 119: Tinio Aff. Ex. C: Barone: Trial Transcript ("Tr.") 566; Def. & Barone Rule 56.1 Stmts. ¶¶ 4, 9-10.)

From 1993 until his retirement in October 2008, Agent Presutti served as Barone's FBI handler–"the agent assigned to regularly interact with the human source." (Barone Aff. ¶ 9; Def. & Barone Rule 56.1 Stmts. ¶¶ 6-7.) Barone states that, "[d]uring that period, all of my contact with the FBI was through Presutti. Even on occasions where I met or spoke to other law enforcement agents, these contacts were always at Presutti's direction and with his personal participation." (Barone Aff. ¶ 9.) If Barone provided Agent Presutti with "positive information," i.e., information regarding potential criminal activity, Agent Presutti would memorialize that information in a Form 302 or similar document. (Tinio Aff. Ex. D: Presutti Dep. at 92-93; Def. &

Barone Rule 56.1 Stmts. ¶ 12.)  On October 31, 2008, Agent Presutti retired and Agent Michael Trombetta, formerly Barone's alternate handler, became Barone's primary handler.  (Def. & Barone Rule 56.1 Stmts. ¶¶ 26-27.)

On December 30, 1999, Barone informed Agent Presutti about a potential murder for hire plot; Agent Presutti detailed that information in a Form 302 dated January 5, 2000.  (Tinio Aff. Ex. G: 1/5/2000 Form 302; Barone Aff. ¶¶ 21-22; Def. & Barone Rule 56.1 Stmts. ¶¶ 14-15.)  The Form 302 states that a man named Tony Piliero[1] told Barone that he wanted to kill his (Piliero's) business partner and another man in Connecticut, Douglas Agnessanto, who was Piliero's employee. (1/5/2000 Form 302; Barone Aff. ¶ 21.)  Piliero allegedly maintained a life insurance policy on Agnessanto, and suggested to Barone that they could collect the policy proceeds if Agnessanto were killed.  (Barone Aff. ¶ 21.)  Barone, however, "was uncertain about the sincerity of [Piliero's] request, so [Barone] told [Piliero] to have fifty thousand dollars ($50,000.00) available after which [Barone] would introduce [Piliero] to someone who would fulfill [Piliero's] request."  (1/5/2000 Form 302; see also Def. & Barone Rule 56.1 Stmts. ¶ 16.)  Barone advised Agent Presutti that, "should [Piliero] contact him again with regard to this request, particularly as it relates to paying the money, [Barone] would contact" Agent Presutti.  (1/5/2000 Form 302; see also Def. & Barone Rule 56.1 Stmts. ¶ 17.)  After speaking with Agent Presutti, Barone had further conversations with Piliero and determined that Piliero was not sincere about committing the murders, which he told Presutti. (Barone Aff. ¶ 23.)

Barone states that he discussed the plot with Piliero and, specifically, the request for $50,000, "without any guidance from the FBI."  (Barone Aff. ¶ 21.)  Agent Presutti did not arrest

---

[1]    Piliero's last name is incorrectly spelled "Pillaro" in the Form 302.  (Barone Rule 56.1 Stmt. ¶ 15.)

Barone "for engaging in this conversation or initiating additional steps, nor did he admonish [Barone] for doing so."  (Barone Aff. ¶ 22.)  "Presumably," Barone states, "that is because, even as early as 1999, I was authorized and encouraged by the FBI to act like an LCN-associate, and to do and say things that LCN associates do, including having potentially very serious-sounding 'criminal conversations' about setting up a murder-for-hire."  (Id.)

**The 2008 Murder For Hire Plot and Barone's Arrest**

In the summer of 2008, Piliero and Barone once again discussed Agnessanto's life insurance policy; as in 1999, Barone told Piliero that he could "'look into'" having Agnessanto killed for a portion of the policy proceeds.  (Dkt. No. 128: Barone Aff. ¶ 25; Dkt. Nos. 120 & 129: Def. & Barone Rule 56.1 Stmts. ¶¶ 36-37.)  "In October or November of 2008, Piliero gave [Barone] a post-it note listing Agnessanto's personal information, including his phone number, address, and Social Security number."  (Def. & Barone Rule 56.1 Stmts. ¶ 38.)

Barone claims that by 2008 he "had formed relationships with higher level organized crime figures in whom the FBI were more keenly interested," and, to maintain his appearance as a "'wise guy,'" he maintained ties "among lower level figures and street criminals" including an individual named Michael Cooks.  (Barone Aff. ¶ 25.)  In fall 2008, Barone told Cooks about the murder plot, provided him directions to Agnessanto's house, and paid him $1,000 "to surveil . . . a location for a possible hit" on Agnessanto.  (Barone Aff. ¶ 26; Def. & Barone Rule 56.1 Stmts. ¶¶ 39-40.)  Cooks traveled to Agnessanto's home and videotaped the area.  (Def. & Barone Rule 56.1 Stmts. ¶ 41; Dkt. No. 119: Tinio Aff. Ex. C: Barone: Tr. 753.)  Cooks and Barone watched the tape together, discussed what Agnessanto's home looked like, the layout of the area, and "went over the various scenarios about how the murder could be carried out."  (Def. & Barone Rule 56.1 Stmts. ¶ 41; Barone: Tr. 753-54.)  They agreed that the murder "had to look like a robbery" because if

"Agnessanto were murdered while his family was being robbed, the insurance company would be less suspicious." (Def. & Barone Rule 56.1 Stmts. ¶ 41; Barone: Tr. 754.) If the hit succeeded, Piliero and Barone agreed to split the insurance proceeds. (Barone: Tr. 755.) Not long thereafter, "[i]n December 2008, Piliero called [Barone] and told him that the insurance policy was going to expire in February 2009." (Def. & Barone Rule 56.1 Stmts. ¶ 42.)

   Unbeknownst to Barone, Cooks was working as a CI with the New York City Police Department. (Def. & Barone Rule 56.1 Stmts. ¶ 29.) In late 2008, Cooks told his handler, NYPD Detective Angel Melendez, that Barone had approached him about the murder for hire. (Def. & Barone Rule 56.1 Stmts. ¶¶ 30-31.) In early January 2009, Det. Melendez arranged a meeting with the NYPD's Organized Crime Information Division and FBI Agent Michael Gaeta at which Cooks described the murder plot. (Dkt. No. 116: Melendez Aff. ¶¶ 8-10; Def. & Barone Rule 56.1 Stmts. ¶ 32; Tinio Aff. Ex. J: Gaeta Dep. at 72.) Agent Gaeta, the Supervisory Special Agent of "the Genovese organized crime squad," assigned FBI Agent Gregorio Miceli to investigate. (Gaeta Dep. at 27, 74.) Agent Miceli met with Cooks who agreed "to become a confidential human source" for the FBI and testify against Barone. (Tinio Aff. Ex. E: Miceli Dep. at 45, 55; see Def. & Barone Rule 56.1 Stmts. ¶ 51.)

   At some point thereafter, Agents Gaeta and Miceli obtained a background check report that stated Barone was "an active informant for the FBI" and listed Agent Trombetta as his handling agent. (Dkt. No. 130: Weissman Aff. Ex. 2: Gaeta Dep. at 84-86.) Agent Gaeta reviewed Barone's FBI "source file" and concluded that Barone was not authorized to engage in a murder for hire conspiracy. (Tinio Aff. Ex. J: Gaeta Dep. at 179-81.) Agent Gaeta also called Agent Trombetta "to advise him that his current informant was now under investigation"; Agent Trombetta confirmed that Barone did not have the authority to plot the murder. (Id. at 87, 90, 181.)

On January 7, 2009, Cooks made a recorded phone call to Barone during which they discussed the murder for hire plot. (Def. & Barone Rule 56.1 Stmts. ¶ 52.) Barone emphasized that the insurance policy was about to expire in February and "if it don't happen within the next week or two . . . that's a hundred large gone, forget about it." (Tinio Aff. Ex. L: 1/7/09 Telecon. Tr. at 2.) Barone reassured Cooks that: "I got 50 already right, already for you right now.  When it's done and I know it's the right way I get the, I get the thing in the paper or whatever the next day, that's it, I got 50 you come and get it." (1/7/09 Telecon. Tr. at 4; Def. & Barone Rule 56.1 Stmts. ¶ 53.)  Cooks reiterated that they would "make it look like . . . the home invasion" to which Barone responded, "[y]es, yes, that's the way I want it, yup," and stated that he could possibly get Cooks a gun. (1/7/09 Telecon. Tr. at 5-6; Def. & Barone Rule 56.1 Stmts. ¶ 55.)  Barone admitted "that at the time of this conversation, he did have over $50,000 in cash ready at his home." (Def. & Barone Rule 56.1 Stmts. ¶ 54.)

On January 9, 2009, Cooks recorded an in-person meeting with Barone involving further discussions about the murder. (Def. & Barone Rule 56.1 Stmts. ¶ 56; Tinio Aff. Ex. M: 1/9/09 Mtg. Tr.)  Barone told Cooks that he needed "to know within this day" whether Cooks' contact would kill Agnessanto because "I gotta make the move on it . . . I thought we had a few months more to work on it, this guy [i.e., Piliero] told me February is the deadline, if I don't do it in January, this guy ain't gonna get paid and then everybody's out of their money." (1/9/09 Tr. at 6.)  If Cooks could not arrange the murder, Barone said he had "another friend" who wanted the job. (1/9/09 Tr. at 4.)  Barone stated that he was trying to get a revolver but cautioned Cooks that "[i]t's only gonna have six shots so make 'em count." (1/9/09 Tr. at 18, 23; Def. & Barone Rule 56.1 Stmts. ¶ 59.)  "At the time of this meeting, [Barone] did have a six-shot revolver in his home." (Def. & Barone Rule 56.1 Stmts. ¶ 60.)

After this meeting, the FBI became concerned that "Barone was attempting to imminently engage the cooperating witness [Cooks] in a murder-for-hire plot," and Agent Gaeta believed "[a]t that point it was clear the threat was very imminent." (Tinio Aff. Ex. N: 4/22/10 Conf. Tr. at 5; Def. & Barone Rule 56.1 Stmts. ¶ 61.) Agent Gaeta contacted "the chief of the organized crime unit for the Southern District of New York," Assistant U.S. Attorney Richard Daddario, "to obtain verbal authorization to arrest" Barone, which he received. (4/22/10 Conf. Tr. at 5; Def. & Barone Rule 56.1 Stmts. ¶¶ 62-63.)

Barone was arrested later that day, January 9, 2009. (Def. & Barone Rule 56.1 Stmts. ¶ 64.) FBI agents searched Barone's home and recovered $50,000 in cash, two guns, a bulletproof vest, and a "'Hitman's Handbook.'" United States v. Barone, 721 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2010); Def. & Barone Rule 56.1 Stmts. ¶ 67. Prior to his arrest, Barone never told Agents Presutti or Trombetta about his renewed discussions with Piliero and Cooks regarding the murder for hire plot, despite having reported his initial conversation with Piliero in 1999. (Def. & Barone Rule 56.1 Stmts. ¶ 43.)

**Barone's Incarceration and Prosecution**

After his arrest, Barone agreed to cooperate with the FBI, and participated in two proffer sessions on January 12 and January 26, 2009 with his defense attorney, the FBI and AUSA Miriam Rocah. (Dkt. No. 119: Tinio Aff. Exs. S & DD; Dkt. Nos. 120 & 129: Def. & Barone Rule 56.1 Stmts. ¶¶ 75-76, 85.) Barone agreed "to make monitored calls and recordings and to have a GPS device installed on his vehicle"; in particular, Barone would attempt to "creat[e] consensual recordings with Piliero, who had not yet been arrested or charged." (Def. & Barone Rule 56.1 Stmts. ¶¶ 79, 83.) "The FBI closed [Barone] as a CI and opened him as a CW with a higher level (Tier 1, not Tier 2) of authority to participate in otherwise illegal activity, given that [Barone] was now

expected to attempt to obtain evidence regarding a crime of violence (the murder for hire plot)."
(Def. & Barone Rule 56.1 Stmts. ¶ 86.)  The filings and transcripts in Barone's criminal case were
sealed to protect his safety.  (Def. & Barone Rule 56.1 Stmts. ¶¶ 78, 82, 87-88; Tinio Aff. Ex. HH:
2/9/09 Conf. Tr. at 32.)

Barone was released from prison pending trial in late January 2009, and on January
30, 2009 was arraigned before Judge Buchwald, who imposed several bail conditions.  (Def. &
Barone Rule 56.1 Stmts. ¶¶ 87, 89.)  While on bail, Barone recorded a meeting with Piliero during
which they discussed the murder for hire plot.  (Def. & Barone Rule 56.1 Stmts. ¶ 90.)  On February
9, 2009, however, Barone was re-arrested and presented before Judge Buchwald for a bail revocation
proceeding.  (Def. & Barone Rule 56.1 Stmts. ¶ 91.)  Prosecutors Kenneth Polite and Miriam Rocah
alleged that Barone had attempted to extort his girlfriend over the proceeds of a house sale, and
failed to use his government-monitored cell phone and vehicle.  (Def. & Barone Rule 56.1 Stmts.
¶ 92; 2/9/09 Conf. Tr. at 5, 8-9, 12.)  AUSA Rocah stated that Barone's actions "solidified for us,
frankly, that he is not a reliable cooperator, someone that we can trust not to do things without our
knowledge."  (2/9/09 Conf. Tr. at 7; Def. & Barone Rule 56.1 Stmts. ¶ 93.)  Judge Buchwald
revoked Barone's bail and ordered him detained.  (Def. & Barone Rule 56.1 Stmts. ¶ 94; 2/9/09
Conf. Tr. at 31.)

Barone claims that he never "materially violated [his] bail conditions."  (Dkt. No.
128: Barone Aff. ¶ 34.)  Rather, following his arrest, Barone states that Agents Gaeta and Miceli
asked him to "'prove [him]self'" by making a recorded phone call to Pat Lombardo, a "notoriously
violent gangster associated with the Gambino family."  (Barone Aff. ¶ 31.)  Barone "told Gaeta and
Miceli that, if [he] attempted to discuss criminal activity over the telephone, Lombardo would
immediately suspect [Barone] was working with law enforcement, [and he] would be 'outed' as an

informant . . . ."  (Id.)  Barone nonetheless "reluctantly agreed to place the call, though, in reality, [he] did not [believe he had] a real choice."  (Id.)  The call backfired; Lombardo stated that he knew Barone had been "'pinched'" and "knew the call was being monitored."  (Barone Aff. ¶ 32.)  Barone's federal defender called AUSA Rocah to express his concern for Barone's safety, which Barone alleges angered Agents Gaeta and Miceli.  (Barone Aff. ¶ 33.)  Barone replaced his assigned counsel with private counsel, George Santangelo, "a well-known criminal defense lawyer who regularly handled Italian organized crime cases."  (Barone Aff. ¶ 34.)  Barone believes that Agents "Gaeta and Miceli decided immediately to punish [Barone] for hiring a so-called 'mob lawyer' by claiming [he] violated [his] bail conditions."  (Id.)

Barone was detained in general population at the Metropolitan Detention Center ("MDC") in Brooklyn until late April 2009.  (Def. & Barone Rule 56.1 Stmts. ¶ 95; Barone Aff. ¶ 35.)  On April 30, 2009, Piliero was arrested for his role in the murder plot based on a criminal complaint drafted by AUSA Polite and sworn out by Agent Miceli.  (Def. & Barone Rule 56.1 Stmts. ¶¶ 96-97.)  Agent Miceli provided some of the information that AUSA Polite used to draft the Piliero complaint, but testified that "[w]hat [Polite] chose to put in the complaint was not [Miceli's] decision."  (Dkt. No. 130: Weissman Aff. Ex. 3: Miceli Dep. at 167-68.)  The complaint referred to Barone only as "CC-1," "a co-conspirator not named as a defendant herein," but did state that "[o]n January 9, 2009, law enforcement agents arrested CC-1 outside his home in Westchester, New York."  (Tinio Aff. Ex. JJ: 4/29/09 USA v. Piliero Complaint ¶¶ 2, 5; Def. & Barone Rule 56.1 Stmts. ¶¶ 99-100.)

That same day, April 30, 2009, the FBI press office received a call from someone at a local newspaper "who figured out CC-1 is Barone and is going to 'out' him."  (Tinio Aff. Ex. KK at 2; Weissman Aff. Ex. 6: Rocah Dep. at 141; Def. & Barone Rule 56.1 Stmts. ¶ 101.)  On May 1,

2009, an article was published online describing the murder plot and outing Barone as an FBI informant:

> The friend Piliero hired [to commit the murder] was arrested by law enforcement officials Jan. 9 at his home in Westchester County, before any hit could be carried out, according to the criminal complaint. Shortly after his arrest, the friend Piliero is accused of hiring began cooperating with FBI agents. . . .
>
> The friend was not identified in the criminal complaint, but is described as a longtime friend of Piliero's.
>
> But according to court records, Joseph S. Barone, 47, was arrested by agents Jan. 9 on a charge of murder for hire. The case against him is still pending in federal court in Manhattan, with several of his proceedings sealed by a judge.
>
> Piliero's lawyer, Michael Santangelo, yesterday acknowledged only that Piliero knew Barone but would not discuss their relationship.
>
> FBI Agent James Margolin, a spokesman for the bureau, declined to comment on Barone's status.

(Tinio Aff. Ex. LL: 5/1/09 Article at 1-2; see also Def. & Barone Rule 56.1 Stmts. ¶¶ 102-05.) A May 14, 2009 memo from the Federal Bureau of Prisons ("BOP") states that on May 1, 2009, the FBI notified the BOP about the news article, and the "information was provided to the [BOP] Office of Special Investigations, MDC, Brooklyn . . . for review." (Tinio Aff. Ex. NN: 5/14/09 BOP Memo at 1.) The memo further states that Barone "was placed in the Special Housing Unit ["SHU"] in the status of Administrative Detention, pending a threat assessment." (Id.) The SHU is separated from general population, but is not solitary confinement. (Def. & Barone Rule 56.1 Stmts. ¶ 112.) "BOP policy defines administrative detention as a non-punitive status in which restricted conditions of confinement are required only to ensure the safety of inmates or others, and is used when the continued presence of the inmate within the general population would pose a serious threat" to the inmate or others. (Dkt. No. 118: Colvin Aff. ¶ 7.)

"BOP officials within the relevant facility are responsible for making the final decision as to whether and how a possible threat to an inmate should be addressed, which could include assigning the inmate to a different or segregated housing unit to separate the inmate from the potential threat." (Def. & Barone Rule 56.1 Stmts. ¶ 111.)  BOP Special Agent Beverly Brown assigned Stephen Rivera, a BOP Special Investigative Services technician, to conduct the threat assessment. (Dkt. No. 117: Brown Aff. ¶¶ 1, 3, 9.)  Brown "recall[s] that BOP executive staff at the MDC Brooklyn ultimately decided to place [Barone] in the SHU as a result of the threat assessment," and "do[es] not recall any involvement by outside law enforcement officers in the decision . . . ." (Brown Aff. ¶¶ 11-12.)

On October 29, 2009, Barone attended an MDC protective custody hearing and claimed that his relocation to the SHU was a ploy by the prosecution "to put pressure on [him] to testify." (Tinio Aff. Ex. OO: 10/29/09 Report at 2.)  The hearing officer found that Barone had been placed in the SHU "for his protection." (Id. at 3; see also Def. & Barone Rule 56.1 Stmts. ¶¶ 114-15.)  Although Barone claimed that he was "suffering" in the SHU (10/29/09 Report at 2), he rejected a December 2009 government offer to move him to general population in a Queens prison facility. (Def. & Barone Rule 56.1 Stmts. ¶ 118; Tinio Aff. Ex. PP: 12/2/09 Conf. Tr. at 5-9.)

On October 30, 2009, AUSA Polite presented the criminal case against Barone to a grand jury through Agent Miceli's testimony; Barone was indicted on three counts: murder for hire, conspiracy to commit murder for hire, and felon in possession of a firearm. (Def. & Barone Rule 56.1 Stmts. ¶ 120; Tinio Aff. Exs. QQ & RR.)  On June 16, 2010, Judge Buchwald ordered Barone's transfer from the MDC to general population at the Metropolitan Correctional Center in Manhattan to await trial. (Def. & Barone Rule 56.1 Stmts. ¶ 119.)

**The Suppression Ruling And Trial**

On June 25, 2010, Judge Buchwald suppressed "all physical evidence seized from Barone's home on the date of his arrest," finding that the FBI agents conducting the search violated Barone's Fourth Amendment rights by exceeding the scope of a lawful "protective sweep," and that Barone's consent to the search was involuntary. United States v. Barone, 721 F. Supp. 2d 261, 269-70 (S.D.N.Y. 2010); see also Dkt. Nos. 120 & 129: Def. & Barone Rule 56.1 Stmts. ¶ 124. Barone and Piliero's trial began on July 19, 2010, at which time, presumably in light of the suppression ruling, the prosecution dismissed the felon in possession of a firearm charge against Barone. (Def. & Barone Rule 56.1 Stmts. ¶¶ 127-28.) On July 29, 2010, the jury found Barone and Piliero not guilty on the murder for hire charge, and hung on the conspiracy charge as to both defendants. (Def. & Barone Rule 56.1 Stmts. ¶ 129.) On September 17, 2010, the Court entered a nolle prosequi on the conspiracy charge against Barone and Piliero. (Def. & Barone Rule 56.1 Stmts. ¶ 130.)

**The Scope Of Barone's FBI Authority**

The scope of Barone's authority to engage in criminal acts was a primary issue during his criminal trial, as it is on this motion. (Dkt. No. 119: Tinio Aff. Ex. C: Tr. 910 ("Barone is claiming that he actually and reasonably thought that he had authority from the FBI to participate in this murder for hire scheme.").) The FBI provides its informants with specific levels of authority to engage in criminal activity. (Trombetta: Tr. 515 ("Q. And what are the rules and regulations that confidential informants or cooperating witnesses have to follow?  A. There are some basic rules. They must abide by the instructions of the FBI, they can't independently act on their behalf . . . . They also can't engage in any criminal activity unless so authorized . . . .").) From 2003 through 2007, Agent Presutti provided Barone with Tier 2 authorization to commit non-violent "otherwise illegal activity" ("OIA"). (Tinio Aff. Ex. I: OIA Authorizations; Tinio Aff. Ex. J: Gaeta Dep. at 104-

05; Dkt. Nos. 120 & 129: Def. & Barone Rule 56.1 Stmts. ¶ 22.)  Permitted Tier 2 OIA was limited

to "criminal conversations" on topics including "collection of debts, extortion, racketeering,

gambling . . . [and] the current nature and structure of various LCN families, and conspiracy to

control and influence legitimate business and industry."  (E.g., Tinio Aff. Ex. I: 1/1/03 OIA

Authorization at 2.)  Beginning on September 24, 2003 through 2007, Barone's OIA authorizations

also stated that Barone "can be expected to engage in criminal conversations regarding . . . attempted

murder/conspiracy."  (E.g., Tinio Aff. Ex. I: 9/24/03 OIA Authorization at 2.)

      Each OIA authorization was limited to ninety days and stated that "under no

circumstances" could Barone: (1) "participate in any act of violence"; (2) obstruct justice, e.g.,

witness tampering, perjury, destruction of evidence; (3) participate in any act "that would be

unlawful conduct by a law enforcement agent," e.g., mail tampering, breaking and entering, illegal

wire tapping; or (4) "initiate or instigate a plan or strategy to commit a federal, state or local

offense."  (See generally OIA Authorizations.)  The authorizations further state that "[i]f the CI/CW

is . . . asked to participate in any such prohibited conduct or if CI/CW learns of plans to engage in

such conduct, CI/CW must immediately report the matter to handling agent.  Participating in this

conduct could subject CI/CW to full criminal prosecution."  (See generally id.)

      In contrast, for the comparatively brief period that Barone acted as a CW following

his arrest (see pages 7-8 above), he was granted Tier 1 OIA authorization permitting activities that

"would constitute a misdemeanor or felony under federal, state, or local law if engaged in by a

person acting without authorization" involving the "commission, or the significant risk of the

commission, of any act of violence."  (Tinio Aff. Ex. FF: 1/22/09 OIA Authorization at 1-2.)  The

Tier 1 OIA form stated that Barone was permitted to "be involved in conspiratorial conversations

involving murder for hire, extortionate collection of credit, [and] conversations for procurement of illegal firearms."  (<u>Id.</u> at 4.)

Along with the OIA authorizations, defendants claim that Barone received yearly Attorney General's Guidelines admonishments, which Agent Presutti described as "parameters or codes of conduct . . . which let a [CI or CW] know what his boundaries are in terms of behavior." (Presutti: Tr. 455.)  Agent Presutti testified that he gave Barone admonishments from the time he became an FBI source in 1993 through 2007.  (Tinio Aff. Ex. D: Presutti Dep. at 118-19; Tinio Aff. Ex. H: AG Admonishments; Def. Rule 56.1 Stmt. ¶ 20.)  The 1994 through 1998 admonishments stated that Barone could not: (1) participate in any act of violence and, if he learned of any plan to commit an act of violence, was required to report the incident to the FBI; (2) "initiate a plan to commit criminal acts"; or (3) "participate in criminal activities unless specifically authorized by the FBI."  (Tinio Aff. Ex. H: 1994-98 AG Admonishments at 1-2.)  The 1994 through 1998 admonishments required Barone to "report all positive information, whether incriminating or absolving, as promptly as possible." (1994-98 AG Admonishments at 1.)  The admonishments from 1999 forward variously state that Barone must follow FBI instructions, "not take or seek to take any independent action on behalf of the" government, and "is not to engage in any unlawful acts, except as specifically authorized by . . . the FBI and is subject to prosecution for any unauthorized unlawful acts."  (Tinio Aff. Ex. H: 1999-2007 AG Admonishments.)

Agent Trombetta testified that when he became Barone's handler after Agent Presutti retired in October 2008 (<u>see</u> page 3 above), Barone was not given any further authorizations. (Trombetta: Tr. 521 ("Q.  While [Barone] was under your watch, what if any authorization did you give him to act in any sort of undercover capacity?  A.  He didn't have any authorization.").)  Agent Trombetta never explicitly told Barone that he was not authorized to engage in criminal

conversations, and did not remember providing Barone any Attorney General admonishments or discussing Barone's OIA authority with Agent Presutti. (Dkt. No. 130: Weissman Aff. Ex. 7: Trombetta Dep. at 55-56.) However, assuming the OIA authorizations were still valid from 2008 forward, Agent Trombetta testified that "giving money to a known criminal" and "giving the address of a potential victim in a murder for hire plot" would not be considered "pure criminal conversation." (Trombetta: Tr. 537.) Agent Presutti testified that planning a murder for hire and giving a potential victim's personal information to a known criminal would not be in the "gray area" of permissible conduct (Presutti: Tr. 508), and that Barone was required to contact Presutti "as soon as possible" if Barone "ever learned about a possible violent crime" (Presutti Dep. at 229).

Barone claims that "[a]t all times, from the beginning of [his] service to the FBI as an informant" until his arrest in January 2009, he "understood from Presutti . . . that [he] was authorized to engage in certain criminal activity in order to gather information for the FBI. This authority included, but was not limited to, engagement in discussions and conversations about the commission of crimes." (Dkt. No. 128: Barone Aff. ¶ 16.) Barone "was generally aware, through [his] discussions with Presutti and as a matter of common sense, that there were limits on what [he] was allowed to do on behalf of the FBI. For example, [Barone] knew that [he] could not commit a criminal act of violence or theft." (Barone Aff. ¶ 18.) But beyond his general understanding of what was and wasn't permitted, Barone states that the full meaning of the term "'criminal conversations'" never was explained to him. (Id.) Agent Presutti admitted that neither he nor the FBI ever provided Barone with any formal training. (Weissman Aff. Ex. 5: Presutti Dep. at 94-96; see also Barone Aff. ¶ 12.) Moreover, Barone asserts that he "was not told of changes in internal FBI policies and procedures, or the 'paperwork' regarding the documentation of [his] authority to engage in certain criminal activity, nor was [he] expected to be aware of FBI policies and

procedures." (Barone Aff. ¶ 17.)  During his time with Agent Presutti, Barone does not recall ever

being told that his authority had a particular expiration date.  (Barone Aff. ¶ 19.)

## ANALYSIS

### I.   SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also, e.g., Celotex

Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); Humphreys v. Cablevision Sys. Corp., 553 F.

App'x 13, 14 (2d Cir. 2014); Connolly v. Calvanese, 515 F. App'x 62, 62 (2d Cir. 2013); Lang v.

Ret. Living Publ'g Co., 949 F.2d 576, 580 (2d Cir. 1991).

The burden of showing that no genuine factual dispute exists rests on the party

seeking summary judgment.  See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct.

1598, 1608 (1970); Alzawahra v. Albany Med. Ctr., 546 F. App'x 53, 54 (2d Cir. 2013); Chambers

v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Gallo v. Prudential Residential Servs., Ltd.

P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  The movant may discharge this burden by demonstrating

to the Court that there is an absence of evidence to support the non-moving party's case on an issue

on which the non-movant has the burden of proof.  See, e.g., Celotex Corp. v. Catrett, 477 U.S. at

323, 106 S. Ct. at 2552-53; Dolan v. Cassella, 543 F. App'x 90, 90 (2d Cir. 2013).

To defeat a summary judgment motion, the non-moving party "'must do more than

simply show that there is some metaphysical doubt as to the material facts.'"  Scott v. Harris, 550

U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986)).  Instead, the non-moving party must "cit[e]

to particular parts of materials in the record" to show that "a fact . . . is genuinely disputed." Fed. R. Civ. P. 56(c)(1); see, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587, 106 S. Ct. at 1356; Alzawahra v. Albany Med. Ctr., 2013 WL 6284286 at *1; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (at summary judgment, "[t]he time has come . . . 'to put up or shut up'"), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S. Ct. at 2513.[2] The Court draws all inferences in favor of the non-moving party only after determining that such inferences are reasonable, considering all the evidence presented. See, e.g., Apex Oil Co. v. DiMauro, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S. Ct. 489 (1987). "If, as to the the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 37.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932, 107 S. Ct. 1570 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510.

---

[2]   See also, e.g., Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y., 552 F. App'x 47, 49 (2d Cir. 2014); Alzawahra v. Albany Med. Ctr., 2013 WL 6284286 at *1; Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 36; Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at 1223.

While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted." Id. at 248, 106 S. Ct. at 2510 (citations omitted); see also, e.g., Knight v. U.S. Fire Ins. Co., 804 F.2d at 11-12.

## II.   SUMMARY JUDGMENT IS GRANTED AS TO BARONE'S MALICIOUS PROSECUTION CLAIM

### A.   Legal Standard Governing Bivens and FTCA Malicious Prosecution Claims

#### 1.   Bivens Actions

Under Bivens and its progeny, federal courts can hear suits for money damages against federal government officials accused of violating constitutional rights.  Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, 396-97, 91 S. Ct. 1999, 2004-05 (1971).[3/]  As Justice Harlan wrote in his oft-cited concurrence in Bivens:  "[F]ederal courts do have the power to award damages for violation of 'constitutionally protected interests' and I agree with the Court that a traditional judicial remedy such as damages is appropriate to the vindication of the personal interests protected by the Fourth Amendment."  Bivens, 403 U.S. at 399, 91 S. Ct.

---

[3/]   See also, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 675, 129 S. Ct. 1937, 1947 (2009); Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 66, 122 S. Ct. 515, 519 (2001) ("In Bivens  . . . we recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights."); Schweiker v. Chilicky, 487 U.S. 412, 421, 108 S. Ct. 2460, 2466 (1988) ("In [Bivens], this Court held that the victim of a Fourth Amendment violation by federal officers acting under color of their authority may bring suit for money damages against the officers in federal court."); Carlson v. Green, 446 U.S. 14, 18-19, 100 S. Ct. 1468, 1471 (1980) ("Bivens established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right."); McGowan v. United States, 825 F.3d 118, 123 (2d Cir. 2016); Atterbury v. U.S. Marshals Serv., 805 F.3d 398, 403 (2d Cir. 2015).

at 2006 (Harlan, J. concurring); see also Erwin Chemerinsky, Federal Jurisdiction § 9.1.2 (7th ed. 2016).[4]

"'Bivens actions are not significantly dissimilar to claims brought under [42 U.S.C.] §§ 1981 and 1983 in terms of the interests being protected, the relief which may be granted, and the defenses which may be asserted.'" Chin v. Bowen, 833 F.2d 21, 23-24 (2d Cir. 1987).[5] "Because the two actions share the same 'practicalities of litigation,' federal courts have typically incorporated

---

[4]   The Supreme Court subsequently expanded the Bivens doctrine to provide money damages for infringements of other constitutional rights by federal officers.  See, e.g., Wilkie v. Robbins, 551 U.S. 537, 549-50, 127 S. Ct. 2588, 2597-98 (2007); Farmer v. Brennan, 511 U.S. 825, 828-34, 114 S. Ct. 1970, 1974-78 (1994); Schweiker v. Chilicky, 487 U.S. at 421, 108 S. Ct. at 2466-67 (summarizing causes of action recognized under Bivens); Davis v Passman, 442 U.S. 228, 243-45, 99 S. Ct. 2264, 2276-77 (1979); see also, e.g., Erwin Chemerinsky, Federal Jurisdiction § 9.1.2 at 651 ("[I]n subsequent decisions the [Supreme] Court recognized the existence of causes of action for infringements of the Fifth, Eighth, and First Amendments.  Lower federal courts have recognized Bivens suits for violations of the First, Fourth, Fifth, Eighth, Ninth, and Fourteenth Amendments." (fns. citing cases omitted)); Arar v. Ashcroft, 585 F.3d 559, 571-72 (2d Cir. 2009) (The Supreme Court has limited the availability of Bivens claims to Fourth Amendment violations, employment discrimination claims in violation of the Due Process Clause, and Eighth Amendment violations by prison officials.), cert. denied, 130 S. Ct. 3409 (2010); Dotson v. Griesa, 398 F.3d 156, 165-66 (2d Cir. 2005) (recognizing the availability of Bivens claims in the context of Fourth, Fifth, and Eighth Amendment violations), cert. denied, 547 U.S. 1191, 126 S. Ct. 2859 (2006); Schweitzer v. Dep't of Veterans Affairs, 23 F. App'x 57, 59 (2d Cir. 2001) ("'Bivens actions' for damages against federal officers [are] permitted for violations of the Due Process Clause of the Fifth Amendment."), cert. denied, 535 U.S. 955, 122 S. Ct. 1359 (2002); Tellier v. Fields, 280 F.3d 69, 76 (2d Cir. 2000) (Bivens claim based on violations of procedural due process rights under the Due Process Clause of the Fifth Amendment); Noguera v. Hasty, 99 Civ. 8786, 2000 WL 1011563 at *8-9 (S.D.N.Y. July 21, 2000) (Peck, M.J.), R. & R. adopted in part, 2001 WL 243535 (S.D.N.Y. Mar. 12, 2001).

[5]    Accord, e.g., Hartman v. Moore, 547 U.S. 250, 255 n.2, 126 S. Ct. 1695, 1700 n.2 (2006) ("Though more limited in some respects not relevant here, a Bivens action is the federal analog to suits brought against state officials under . . . § 1983."); Mangino v. Inc. Vill. of Patchogue, 808 F.3d 951, 956 n.2 (2d Cir. 2015); Elohim Bey v. Fernandez, No. 15-CV-7237, 2016 WL 845324 at *2 (E.D.N.Y. Mar. 2, 2016).

§ 1983 law into <u>Bivens</u> actions." <u>Tavarez</u> v. <u>Reno</u>, 54 F.3d 109, 110 (2d Cir. 1995) (citation omitted).[6/]

### 2.    Federal Tort Claims Act Actions

The Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, et seq., "waives the United States' sovereign immunity for certain intentional torts committed by law enforcement officers," including malicious prosecution. <u>Millbrook</u> v. <u>United States</u>, 133 S. Ct. 1441, 1444 (2013); <u>Liranzo</u> v. <u>United States</u>, 690 F.3d 78, 85 (2d Cir. 2012); <u>Barone</u> v. <u>United States</u>, 12 Civ. 4103, 2015 WL 10791889 at *19 (S.D.N.Y. Oct. 29, 2015), <u>R. & R. adopted in part</u>, 2016 WL 2658174 (S.D.N.Y. May 5, 2016) (Kaplan, D.J.); 28 U.S.C. § 2680(h).

### 3.    The Elements Of Malicious Prosecution

New York law governs Barone's malicious prosecution claim under <u>Bivens</u> and the FTCA. <u>Barone</u> v. <u>United States</u>, 12 Civ. 4103, 2015 WL 10791889 at *9, *19 (S.D.N.Y. Oct. 29, 2015), <u>R. & R. adopted in part</u>, 2016 WL 2658174 (S.D.N.Y. May 5, 2016) (Kaplan, D.J.).[7/] Barone

---

[6/]    <u>See</u>, <u>e.g.</u>, <u>Butz</u> v. <u>Economou</u>, 438 U.S. 478, 504, 98 S. Ct. 2894, 2909 (1978) (no "distinction for purposes of immunity law" between <u>Bivens</u> and § 1983 claims); <u>Gonzalez</u> v. <u>Hasty</u>, 802 F.3d 212, 221 (2d Cir. 2015); <u>Morales</u> v. <u>City of N.Y.</u>, 752 F.3d 234, 237 (2d Cir. 2014); <u>Shue</u> v. <u>United States</u>, 466 F. App'x 51, 51 (2d Cir. 2012); <u>Polanco</u> v. <u>U.S. Drug Enforcement Admin.</u>, 158 F.3d 647, 653 (2d Cir.1998) (same statute of limitation applies to <u>Bivens</u> and § 1983 claims); <u>Chin</u> v. <u>Bowen</u>, 833 F.2d at 24 ("[T]here is a 'general trend in the appellate courts to incorporate § 1983 law into <u>Bivens</u> suits.'"); <u>Ellis</u> v. <u>Blum</u>, 643 F.2d 68, 83-84 (2d Cir. 1981) (same rule of damages applies to <u>Bivens</u> and § 1983 claims); <u>Garcia</u> v. <u>Watts</u>, 08 Civ. 7778, 2009 WL 2777085 at *12 n.14 (S.D.N.Y. Sept. 1, 2009) ("'<u>Bivens</u> claims are treated as analogous to claims under 42 U.S.C. § 1983 and incorporate the same law.'"); <u>DeMartino</u> v. <u>Zenk</u>, No. 04-CV-3880, 2009 WL 2611308 at *8 n.5 (E.D.N.Y. Aug. 25, 2009); <u>Alcantara</u> v. <u>City of N.Y.</u>, 646 F. Supp. 2d 449, 456-57 (S.D.N.Y. 2009); <u>Connors</u> v. <u>Heywright</u>, 02 Civ. 9988, 2003 WL 21087886 at *2 n.1 (May 12, 2003) (Chin, D.J.) ("In general, case law under § 1983 applies to <u>Bivens</u> cases.").

[7/]    <u>See also</u>, <u>e.g.</u>, <u>Liranzo</u> v. <u>United States</u>, 690 F.3d 78, 86 (2d Cir. 2012) ("[T]he FTCA directs courts to consult state law to determine whether the government is liable for the torts of its
(continued...)

concedes that New York law applies.  (Dkt. No. 127: Barone Br. at 22 n.9.)  "To establish a malicious prosecution claim under New York law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions."  Manganiello v. City of N.Y., 612 F.3d 149, 161 (2d Cir. 2010) (quotations omitted); accord, e.g.,  Barone v. United States, 2015 WL 10791889 at *9, *19; Torres v. Jones, 26 N.Y.3d 742, 760, 27 N.Y.S.3d 468, 481 (2016).  Barone agrees that this is the legal standard.  (Barone Br. at 22.)

"[A] malicious prosecution plaintiff must show the absence of probable cause for prosecution."  Restivo v. Hessemann, No. 14-4662-CV, --- F.3d ----, 2017 WL 218006 at *14 (2d Cir. Jan. 19, 2017).  "Probable cause, in the context of malicious prosecution, has . . . been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty" or "that [the prosecution] could succeed."  Boyd v. City of N.Y., 336 F.3d 72, 76 (2d Cir. 2003); see also, e.g., Tyk v. Surat, No. 15-3813, 2017 WL 129145 at *1 (2d Cir. Jan. 12, 2017); Barua v. City of N.Y., 14 Civ. 584, 2016 WL 7494875 at *10 (S.D.N.Y. Dec. 29, 2016).  "'Probable cause does not require proof sufficient to warrant a conviction beyond a reasonable doubt but merely information sufficient to support a reasonable belief that an offense has been . . . committed by the

---

7/      (...continued)
        employees.");  Shapiro v. Goldman, 14 Civ. 10119, 2016 WL 4371741 at *16 (S.D.N.Y. Aug. 15, 2016) ("Count Three asserts a Bivens claim for malicious prosecution. . . .  New York law applies because the alleged misconduct occurred in New York.");  Tyus v. Newton, No. 13-CV-1486, 2015 WL 5306550 at *7 (D. Conn. Sept. 10, 2015) ("Claims for false arrest and malicious prosecution, whether brought under section 1983, pursuant to Bivens, or under state law, are assessed under the laws of the state in which the plaintiff was allegedly illegally arrested or maliciously prosecuted.");  Morel v. Reed, No. 11-CV-1808, 2015 WL 1506132 at *5 & n.3 (E.D.N.Y. Mar. 31, 2015); 28 U.S.C. § 1346(b)(1).

suspect.'" Restivo v. Hessemann, 2017 WL 218006 at *15.  Probable cause is based on "the totality of the circumstances" and may exist even where an officer reasonably relies on mistaken information, although "'the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.'" Manganiello v. City of N.Y., 612 F.3d at 161. "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." Savino v. City of N.Y., 331 F.3d 63, 72 (2d Cir. 2003).

A grand jury indictment "creates a presumption of probable cause that may only be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" Id.[8/]  Barone concedes that this is the correct legal standard.  (Barone Br. at 25.)  It is the plaintiff's burden to rebut the presumption of probable cause that flows from an indictment.  Savino v. City of N.Y., 331 F.3d at 73 ("In order to survive a motion for summary judgment on the malicious prosecution claim, [plaintiff] must have submitted evidence sufficient for a reasonable jury to find that his indictment was procured as a result of police conduct undertaken in bad faith.").

**B.     Probable Cause Supported Barone's Prosecution**

Because Barone was indicted (see page 11 above), he must rebut the presumption of probable cause.  Barone argues that the FBI obtained the indictment against him "through fraud and suppression of key evidence" during the grand jury proceedings, including the following: (1) Agent

---

[8/]     Accord, e.g., Allen v. Antal, No. 15-3252-cv, 2016 WL 7234682 at *2 (2d Cir. Dec. 14, 2016); Fappiano v. City of N.Y., 640 F. App'x 115, 119 (2d Cir.), cert. denied, 137 S. Ct. 341 (2016); Stansbury v. Wertman, 721 F.3d 84, 95 (2d Cir. 2013); Torres v. Jones, 26 N.Y.3d at 762, 27 N.Y.S.3d at 483 ("[T]he presumption may be overcome 'by evidence establishing that the police witnesses have not made a complete and full statement of facts . . . to the [prosecutor], that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith.'").

Presutti's January 2000 Form 302 that memorialized Barone's first discussion with Piliero in 1999 about the murder plot; (2) information regarding Barone's "years of authority, formally documented or otherwise, to engage in" OIA; and (3) Barone's "long history as a valued and trusted FBI informant." (Dkt. No. 127: Barone Br. at 18-19; see pages 1-4 above.) Barone claims that he was "OIA authorized at the time of his arrest" and that his 2008 conversations with Cooks and Piliero were merely a continuation of the FBI-sanctioned investigation into Piliero that began in 1999 when Barone first reported the plot. (Barone Br. at 22-24; see page 3 above.)

There is no evidence that the indictment was procured through the suppression of evidence or other government misconduct because none of the allegedly suppressed information would have negated the probable cause to prosecute Barone. Barone's history with the FBI and his source file, including the 2000 Form 302, do not show that he was authorized to engage in the 2008 murder for hire plot; rather, it is Barone's own characterization of his FBI authority that he claims negates probable cause. See, e.g., Torres v. Jones, 26 N.Y.3d 742, 761, 27 N.Y.S.3d 468, 482 (2016) ("Generally, the plaintiff cannot rebut the presumption of probable cause with evidence merely indicating that the authorities acquired information that, depending on the inferences one might choose to draw, might have fallen somewhat shy of establishing probable cause.").[9]

Not one of the FBI agents involved in Barone's handling or his subsequent arrest and prosecution testified that Barone was even arguably authorized to discuss murder for hire. (See pages 14-15 above.) While some of Barone's Tier 2 OIA authorizations permitted "criminal

---

[9]    On this point, the Court agrees with defendants that "[e]ven if [Barone] somehow believed that the 2000 report," or his perceived FBI authority, "conferred authority upon him to discuss murder for hire . . . it is Defendants' state of mind or intent, not [Barone's] subjective understanding, that is relevant." (Dkt. No. 115: Def. Br. at 30 n.6); see also, e.g., Cardoza v. City of N.Y., 139 A.D.3d 151, 163-64, 29 N.Y.S.3d 330, 340 (1st Dep't 2016).

24

conversations regarding . . . attempted murder/conspiracy," Agent Trombetta testified that overt acts such as "giving money to a known criminal" and "giving the address of a potential victim in a murder for hire plot" would not be considered "pure criminal conversation," even assuming Barone's Tier 2 OIA authorizations were still valid from 2008 forward.  (See page 15 above.)  Agent Presutti also testified that the same actions would not have been in the "gray area" of permissible conduct and that Barone was required to immediately report a crime of violence.  (See page 15 above); see also United States v. Barone, 09 Cr. 91, 2011 WL 4056903 at *6 (S.D.N.Y. Aug. 29, 2011) ("Barone also contends that the Government's position was in bad faith because it 'had authorized Mr. Barone to engage in the very same conduct that he was arrested for, to wit: murder-for-hire, racketeering and conspiracy.'  This claim is simply not supported by the record. . . .  Special Agent Presutti . . . testified that Barone was not authorized to engage in such criminal conduct and that if Barone had been presented with a request to commit a crime, he needed to report it to the FBI.").  For months from the summer of 2008 until his arrest in January 2009, Barone never told Agents Presutti or Trombetta about his renewed discussions with Piliero and Cooks regarding the murder for hire plot. (See page 7 above.)  Even if the grand jury was presented with evidence that Barone had been an active FBI informant for years and had told the FBI of a similar plot in 1999, that evidence would not have negated probable cause to support the prosecution, since Barone did not inform the FBI of the 2008 plot.

Moreover, the physical evidence seized from Barone's home was highly incriminating; the FBI found $50,000 in cash, two guns, a bulletproof vest, and a "'Hitman's Handbook'" (see page 7 above) that Agent Miceli described as a "manual on how to commit murder for hire."  (Dkt. No. 119: Tinio Aff. Ex. QQ: Grand Jury Tr. at 10); see also United States v. Barone, 387 F. App'x 88, 90 (2d Cir. 2010) ("At the time of his arrest, Barone was in possession of two

firearms, ammunition, a bulletproof vest, a 'how to' guide for conducting assassinations, and $50,000 in cash, all of which would have allowed the charged murder to be committed.").  "The fact that evidence ultimately proves inadmissible does not make it irrelevant to the evaluation of probable cause at the time police are presented with it."  Restivo v. Hessemann, No. 14-4662-CV, --- F.3d ----, 2017 WL 218006 at *15 (2d Cir. Jan. 19, 2017).

The evidence cited by Barone does not suggest otherwise.  Barone argues that Agent "Trombetta falsely told prosecutors and other FBI agents, that Barone was not authorized by the FBI to engage in criminal conversations when Trombetta, in fact, had no idea whether Barone was so authorized when Barone was arrested."  (Barone Br. at 25.)  Prior to Barone's arrest, Agent Gaeta called Agent Trombetta who confirmed that Barone did not have the authority to plot the murder.  (See page 5 above.)  Even if Agent Trombetta truly did not know whether or not Barone was OIA authorized (which the cited testimony does not establish), the probable cause to arrest Barone is not at issue here.  See, e.g., Posr v. Court Officer Shield No. 207, 180 F.3d 409, 417 (2d Cir. 1999) ("The defendants seem to conflate probable cause to arrest with probable cause to believe that [the plaintiff] could be successfully prosecuted.  Only the latter kind of probable cause is at issue with respect to the malicious prosecution claim . . . .").  Agents Trombetta and Presutti maintained through the time of trial that Barone's conduct never was authorized, and after Barone's arrest the case against him only became stronger once his home was searched.  (See pages 7, 14-15 above.)

In a further effort to establish an FBI conspiracy, Barone cites a text message from Agent Gaeta to Agent Miceli on January 12, 2009, sent prior to Barone's first proffer session the same day.  (Barone Br. at 14.)  In the message, Agent Gaeta tells Agent Miceli to "[t]ake very general notes not too much until he [Barone] gets his story straight."  (Dkt. No. 130: Weissman Aff. Ex. 24 at 1.)  Barone argues that "[o]ne reasonable inference from Gaeta's instruction to Miceli is

that Gaeta and Miceli did not want to create a full and complete evidentiary record in the event that Barone provided exculpatory information that the United States might later have to turn over [to] the defense." (Barone Br. at 14.)  The Court cannot conceive how this text message exhibits an FBI conspiracy to suppress evidence from the defense when Barone's defense attorney and AUSA Rocah were present at both proffer sessions.  (See page 7 above.)  If instead Barone means that the FBI proffer notes were the official record of the proffer sessions that would be communicated to the prosecution, including AUSA Polite who presented the grand jury case, Barone does not identify any exculpatory information he provided during the proffers other than his generic claim that "his discussions . . . relating to the murder-for-hire scheme were 'just talk.'"  (Weissman Aff. Ex. 13: 6/22/10 Letter at 1.)  That evidence would not have negated probable cause to prosecute Barone.

Defendants' motion for summary judgment as to Barone's malicious prosecution claim under Bivens and the FTCA accordingly is GRANTED.[10/]

_____

10/     Barone's brief states:

It should be noted that, under the Federal Tort Claims Act (FTCA), the United States is liable for the tortious acts of any of its law enforcement agents acting within the scope of their employment, not simply those officers who may be named in a complaint.  In other words, here, the United States may be held liable for malicious prosecution or intentional infliction of emotional distress under the FTCA even if the named individual FBI agents are not.

(Barone Br. at 21, citations omitted.)  Barone, however, does not argue that anyone other than the named Agent defendants are liable for his alleged malicious prosecution (Dkt. No. 135: Def. Reply Br. at 14; see Barone Br.), and the prosecutors cannot be held liable under the FTCA.  See, e.g., Bernard v. United States, 25 F.3d 98, 104 (2d Cir. 1994) ("[T]he FTCA does not authorize suits for intentional torts based upon the actions of Government prosecutors."); Shapiro v. Goldman, 14 Civ. 10119, 2016 WL 4371741 at *22 (S.D.N.Y. Aug. 15, 2016) ("Government prosecutors are not 'investigative or law enforcement officers' within the meaning of the FTCA."); Simone v. United States, No. 09-CV-3904, 2015 WL 419691 at *23 (E.D.N.Y. Jan. 30, 2015) ("[I]ntentional tort claims predicated on the actions of federal prosecutors fall outside the FTCA's waiver of sovereign immunity, and are barred
(continued...)

**III.    SUMMARY JUDGMENT IS GRANTED AS TO BARONE'S DUE PROCESS CLAIM**

**A.    Legal Standards Governing Due Process Conditions Of Confinement Claims**

"The Fifth Amendment's Due Process Clause forbids subjecting pretrial detainees to punitive restrictions or conditions." Turkmen v. Hasty, 789 F.3d 218, 237 (2d Cir. 2015), cert. granted, 137 S. Ct. 292 (2016).  To establish a conditions of confinement claim, a plaintiff must show that the defendant, "(1) with punitive intent, (2) personally engaged in conduct that caused the challenged conditions of confinement." Id. at 238; accord, e.g., Barone v. United States, 12 Civ. 4103, 2016 WL 2658174 at *2 (S.D.N.Y. May 5, 2016).  "Absent 'an expressed intent to punish,' we may only infer that Defendants acted with punitive intent if the challenged conditions were 'not reasonably related to a legitimate goal–if [they were] arbitrary or purposeless.'" Turkmen v. Hasty, 789 F.3d at 238 (quoting Bell v. Wolfish, 441 U.S. 520, 538-39, 99 S. Ct. 1861, 1873-74 (1979)).  "Retribution and deterrence are not legitimate nonpunitive governmental objectives." Bell v. Wolfish, 441 U.S. at 573 n.20, 99 S. Ct. at 1892 n.20.  However, "[f]ederal courts have long recognized that punitive intent is not often admitted. . . .  If the conditions under which one is held have no reasonable connection to a legitimate goal of the state, then one logical assumption is that they are imposed for no other purpose than to punish." Turkmen v. Hasty, 789 F.3d at 244.

---

[10]/    (...continued)
by § 2680(h)."), aff'd, 642 F. App'x 73 (2d Cir. 2016); Barone v. United States, 12 Civ. 4103, 2014 WL 4467780 at *9 (S.D.N.Y. Sept. 10, 2014).

B.    **Barone Cannot Establish A Due Process Claim**

1.    **Barone's SHU Confinement**

Barone claims that defendants' conduct created the condition that led to his confinement in the SHU.  (See Dkt. No. 127: Barone Br. at 32-33.)[11]  Barone argues that Agent Miceli "recklessly or intentionally furnished information to the prosecutors about Barone that would be used in a publicly filed criminal complaint [against Piliero], without so much as warning the prosecutors that the information, if not sealed, would expose Barone's identity and status as an FBI informant." (Barone Br. at 32-33.)  The Piliero complaint referred to Barone only as "CC-1," "a co-conspirator not named as a defendant herein."  (See page 9 above.)  However, the complaint also stated that "[o]n January 9, 2009, law enforcement agents arrested CC-1 outside his home in Westchester, New York."  (See id.)  Barone claims that this information allowed the public to discern his identity and resulted in the newspaper article that exposed him as an FBI informant. (Barone Br. at 33; see pages 9-10 above.)  After the article was published, Barone was placed in the SHU pending a threat assessment.  (See page 10 above.)

In his order on defendants' motion to dismiss, Judge Kaplan wrote that he was "skeptical" that Barone had asserted his due process claim against the correct defendants because operation of the SHU was delegated to the BOP, not the FBI.  Barone v. United States, 2016 WL 2658174 at *2.  Barone does not dispute that "BOP officials within the relevant facility are

---

[11]    In his Report & Recommendation on defendants' motion to dismiss, Judge Dolinger read Barone's complaint to state an additional due process claim based on Barone's confinement in the SHU "for well over a year without any hearing."  Barone v. United States, 12 Civ. 4103, 2015 WL 10791889 at *13 (S.D.N.Y. Oct. 29, 2015), R. & R. adopted in part, 2016 WL 2658174 (S.D.N.Y. May 5, 2016).  Judge Kaplan, however, only allowed Barone's due process claim to proceed on the theory that defendants had leaked his CI status since operation of the SHU was delegated solely to the BOP.  Barone v. United States, 12 Civ. 4103, 2016 WL 2658174 at *2 (S.D.N.Y. May 5, 2016).

responsible for making the final decision as to whether and how a possible threat to an inmate should be addressed, which could include assigning the inmate to a different or segregated housing unit to separate the inmate from the potential threat."  (See page 11 above.)  Judge Kaplan nevertheless was "persuaded that [Barone] has stated a claim on the alternate theory that the FBI Defendants purposefully and punitively leaked Barone's CI status which, in turn, caused the general prison population to be unsafe for Barone and necessitated his confinement in the SHU."  Barone v. United States, 2016 WL 2658174 at *2.[12/]

Agent Miceli provided some of the information that AUSA Polite used to draft the complaint and "sw[ore] to the accuracy of the information . . . contained in it."  (Tinio Aff. Ex. R: Polite Dep. at 114; see page 9 above.)  AUSA Polite, however, testified that the information in the complaint was derived "from a collection of sources," including a "review of evidence and documents that [he] had collected in connection with the investigation and prosecution thus far, Mr.

---

[12/]    Barone halfheartedly defends his original liability theory in a footnote in his brief that states: "There is also evidence in the record sufficient to raise a reasonable inference that FBI agents directed agents of the Bureau of Prisons to place Plaintiff into" the SHU. (Barone Br. at 37 n.17.) However, Barone admits that BOP officials ultimately decide whether or not to house an inmate in the SHU, and that, "[p]ending the completion of the threat assessment, BOP staff at the MDC decided to house Plaintiff in the" SHU. (Dkt. Nos. 120 & 129: Def. & Barone Rule 56.1 Stmts. ¶ 112, emphasis added.)  The two exhibits cited by Barone do not permit a reasonable inference to the contrary.  Both exhibits state that BOP officials chose to place Barone in the SHU after receiving the newspaper article from the FBI. (See Dkt. No. 119: Tinio Aff. Ex. NN at 1 ("[T]his writer was advised by Special Agent Joy Adam of the FBI, NYO, that a news article . . . indicated inmate Barone . . . was a cooperating witness for the FBI in a murder for hire case."); Tinio Aff. Ex. OO at 3 ("Inmate Barone . . . is housed in SHU for his protection based on information received by an outside Law Enforcement agency.").)  This evidence does not indicate that Barone's transfer was motivated by "punitive intent," as opposed to a legitimate concern for Barone's safety once his informant status was leaked. See, e.g., Cabral v. Strada, 513 F. App'x 99, 101 (2d Cir. 2013) (Plaintiffs "have not offered any evidence that the MDC officials who decided to place the [plaintiffs] in the SHU acted with punitive intent.  Rather, the evidence supports the district court's finding that their placement in the SHU was motivated by safety concerns.").

Barone's own complaint, as well as information learned from agents." (Polite Dep. at 110.) There is no evidence that Agent Miceli specifically asked AUSA Polite to include the date and location of Barone's address in the complaint. To the contrary, AUSA Polite testified that he believed the details of Barone's arrest were "critical to" the "full narrative" of the case. (Dkt. No. 130: Weissman Aff. Ex. 4: Polite Dep. at 126-27.) Moreover, AUSA Polite testified that "AUSAs are responsible for drafting complaints" (Weissman Aff. Ex. 4: Polite Dep. at 114), and while Agent Miceli "provided Mr. Polite with investigative documents[,] [w]hat [Polite] chose to put in the complaint was not [Miceli's] decision." (Weissman Aff. Ex 3: Miceli Dep. at 167-68.) On this record, the Court cannot reasonably infer that Agent Miceli acted with the "punitive intent" necessary to Barone's due process claim, and negligence alone does not suffice. See, e.g., Davidson v. Cannon, 474 U.S. 344, 348, 106 S. Ct. 668, 671 (1986) ("[T]he protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care . . . .").[13]

### 2.    Barone's Call To Lombardo

Barone claims that after his arrest Agents Gaeta and Miceli asked him to "'prove [him]self'" by making a recorded phone call to Pat Lombardo, a "notoriously violent gangster associated with the Gambino family." (See pages 8-9 above.) Barone "told Gaeta and Miceli that, if [he] attempted to discuss criminal activity over the telephone, Lombardo would immediately suspect [Barone] was working with law enforcement, [and he] would be 'outed' as an informant . . . ." (See id.) Barone nonetheless "reluctantly agreed to place the call, though, in reality, [he] did

---

[13]    See also, e.g., Adekoya v. Fed. Bureau of Prisons, 375 F. App'x 119, 121 (2d Cir. 2010) ("To the extent [plaintiff] alleges negligence, he fails to state a Fifth Amendment due process claim . . . ."); Shaul v. Cherry Valley-Springfield Cent. Sch. Dist., 363 F.3d 177, 187 (2d Cir. 2004) ("It is well established that mere negligence is insufficient as a matter of law to state a due process violation.").

not [believe he had] a real choice." (See page 9 above.)  The call backfired; Lombardo stated that

he knew Barone had been "'pinched'" and "knew the call was being monitored," thus allegedly

exposing Barone's cooperation with the FBI.  (See id.)  Barone argues that defendants' "conduct in

knowingly forcing Barone to make this risky monitored telephone call, for, admittedly, no legitimate

investigative purpose, is further evidence that Defendants Miceli and Gaeta – agents responsible for

protecting Barone – instead intentionally or recklessly exposed Barone as an informant." (Dkt. No.

127: Barone Br. at 34.)

Regardless of whether or not Barone voluntarily made the call, there is no connection

between the call to Lombardo and Barone's detention in the SHU.  Barone and Lombardo spoke on

January 13, 2009.  (Dkt. No. 130: Weissman Aff. Ex. 11: 1/13/09 Tr.)  Barone was detained in

general population until the newspaper article that identified him as "CC-1" was released in May

2009, at which point Barone was placed in the SHU.  (See pages 9-10 above.)  The record

accordingly reflects that the newspaper article, not the phone call to Lombardo several months

earlier, triggered Barone's SHU detention.  Barone therefore cannot establish that Agents Gaeta and

Miceli punitively leaked his informant status, or that they caused his detention in the SHU.

Summary judgment on Barone's due process claim accordingly is GRANTED.[14]

---

[14]    Barone cannot establish defendants' punitive intent through sheer speculation.  Barone
claims in his affidavit that Agents "Gaeta and Miceli decided immediately to punish
[Barone] for hiring a so-called 'mob lawyer' by claiming [he] violated [his] bail conditions."
(See page 9 above.)  Barone's claim that he never "materially violated [his] bail conditions"
stands in stark contrast to Judge Buchwald's detention order following the prosecution's
allegations that Barone had attempted to extort his girlfriend over the proceeds of a house
sale, and failed to use his government-monitored cell phone and vehicle.  (See page 8
above.)  While Barone's lawyer contested the government's extortion allegation, he did not
dispute that Barone had not used the appropriate cell phone or vehicle. (Tinio Aff. Ex. HH:
2/9/09 Conf. Tr. at 22-25.)  Barone also claims, without further explanation or citation to
other evidence, that he "was angrily told by Gaeta and Miceli, in sum and substance, that
(continued...)

**IV.   SUMMARY JUDGMENT IS GRANTED AS TO BARONE'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ("IIED") CLAIM**

**A.   Legal Standards Governing IIED Claims**

In New York, there are "four elements of a cause of action for intentional infliction of emotional distress: '(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.'" Chanko v. Am. Broad. Cos. Inc., 27 N.Y.3d 46, 56, 29 N.Y.S.3d 879, 886 (2016).  "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. (quotations omitted).  "IIED, although providing relief for plaintiffs upon occasion . . . , remains a 'highly disfavored [tort] under New York law.'  It 'is to be invoked only as a last resort.'" Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 158 (2d Cir. 2014) (citation omitted); see also, e.g., Howell v. N.Y. Post Co., 81 N.Y.2d 115, 122, 596 N.Y.S.2d 350, 353 (1993) ("[T]he 'requirements of the

---

14/    (...continued)
[he] should not ever go over the FBI's heads again" after Barone's attorney called AUSA Rocah to express concern for Barone's safety following the Lombardo call.  (Dkt. No. 128: Barone Aff. ¶ 33.)  The Court cannot infer from these vague and unsupported allegations that defendants punitively sought Barone's SHU detention because they were angry Barone had hired a particular lawyer or expressed safety concerns.  See, e.g., ICBC (London) PLC v. Blacksands Pac. Grp., Inc., No. 15-3387, 2016 WL 5386293 at *2 (2d Cir. Sept. 26, 2016) ("'Though we must accept as true the allegations of the party defending against the summary judgment motion, drawing all reasonable inferences in his favor, conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment.'"); Messinger v. JPMorgan Chase Bank, N.A., 126 F. Supp. 3d 376, 382 (S.D.N.Y. 2015) ("'[C]onclusory allegations, conjecture, and speculation, . . . are insufficient to create a genuine issue of fact.'  Similarly, '[v]ague assertions supported only by self-serving statements in the nonmoving party's affidavit are insufficient to defeat a properly supported summary judgment motion.'" (citation omitted)), appeal withdrawn (Mar. 16, 2016).

rule are rigorous, and difficult to satisfy.'  Indeed, of the intentional infliction of emotional distress claims considered by this Court, every one has failed because the alleged conduct was not sufficiently outrageous." (citations omitted)).

### B.      Barone Has Not Established An IIED Claim

Discovery has not borne out some of Barone's most serious allegations.  Barone's prosecution was supported by probable cause, and there is no evidence that the Agent defendants punitively leaked Barone's CI status.  (See pages 7-16 above.)  Even if the evidence showed that Agent Miceli directed AUSA Polite to include the date and location of Barone's arrest in the criminal complaint, which did not explicitly identify Barone by name, such conduct does not "go beyond all possible bounds of decency" to be regarded as "utterly intolerable in a civilized community" as a matter of law.  Chanko v. Am. Broad. Cos. Inc., 27 N.Y.3d 46, 56, 29 N.Y.S.3d 879, 886 (2016); see also, e.g., Stuto v. Fleishman, 164 F.3d 820, 827 (2d Cir. 1999) ("Whether the conduct alleged may reasonably be regarded as so extreme and outrageous as to permit recovery is a matter for the court to determine in the first instance."); Howell v. N.Y. Post Co., 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 353 (1993) ("In practice, courts have tended to focus on the outrageousness element, the one most susceptible to determination as a matter of law.").  Likewise, the FBI's request that Barone call Lombardo, which did not result in any harm or threat of harm to Barone, cannot be classified as "outrageous" as the case law defines the term.  (See pages 8-9 above.)  Thus, because Barone cannot satisfy the sky-high burden necessary to support an IIED claim, summary judgment is GRANTED as to this claim.

34

## CONCLUSION

For the reasons set forth above, defendants' summary judgment motion (Dkt. No. 114) is GRANTED with respect to Barone's malicious prosecution, due process and intentional infliction of emotional distress claims.   The Clerk of Court is directed to enter judgment for defendants and to close the case.

SO ORDERED.

Dated:          New York, New York
               February 6, 2017

_____
**Andrew J. Peck**
United States Magistrate Judge


Copies ECF to:          All Counsel